**Bobby G. McNEILL, as Guardian ad Litem of Matthew A. McNeill, a Minor under the age of fourteen (14) years**

v.

**UNITED STATES of America.**

**Civ. A. No. 79–0970–3.**

United States District Court,
D. South Carolina,
Florence Division.

June 24, 1981.

Ellis I. Kahn, Charleston, S.C., and George W. Gregory, Cheraw, S.C., for plaintiff.

Cameron M. Currie, Asst. U. S. Atty., Columbia, S. C., for defendant.

## ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

Plaintiff, Matthew A. McNeill, a minor born October 9, 1977, has instituted this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and all of the jurisdictional prerequisites have been met. He seeks money damages for alleged medical negligence on the part of employees of Defendant United States of America, acting within the scope and course of their employment, in administering medical care to him at the U. S. Air Force Base Hospital at Myrtle Beach, South Carolina, on August 27th and 28th, 1978. The parents had filed an administrative claim, but did not institute suit. The time during which the parents could file suit has expired.

Matthew McNeill had a relatively problem-free first ten months of life, with normal development, and he so appeared. (T-p. 275) Matthew's father, the Guardian ad Litem here, Bobby G. McNeill, was on active military duty at all times pertinent, and he and his family took leave some time in mid-August of 1978, returning to Myrtle Beach during the later part of August.

Mr. and Mrs. McNeill brought Matthew to the Emergency Room at Myrtle Beach Air Force Base Hospital on August 27, 1978, during the early evening hours, with complaints that his right hand was swollen, reddish on top with a bluish discoloration at the palmer (inner aspect) of the youngster's wrist. There was a rash on his chest. The youngster was lethargic and felt feverish, but Mr. and Mrs. McNeill did not know his temperature as they had no thermometer. They had given him baby aspirin for the fever. (T-pp. 32–33) Sgt. David Denton, a para-medic who was on active duty as part of his reserve commitment, first saw the McNeills when they entered the Emergency Room. He made inquiry as to the nature of the child's problems, and he instructed them to take Matthew into an examining room, to remove his clothing and they showed him the youngster's hand. (T-pp. 34–35) Sgt. Denton created a new chart on the youngster as he had not been a patient at the hospital before. (T-p. 35) The paramedic took the child's temperature, examined the hand and returned with the medical officer of the day who was manning the Emergency Room, Doctor Vincent DeAugustine, a Lieutenant Colonel in the Air Force. Doctor DeAugustine and Sgt. Denton talked,

looked at the hand and left, but the physician did not closely examine the child. (T-p. 36) Doctor DeAugustine did not examine the youngster's ears and chest. He did not check his pulse, respirations, he did not move the hand or neck, and he literally did not touch the child. (T-pp. 197–198). As mentioned, the youngster's hand was puffy, with the margin at the wrist bluish, the hand was very sensitive, and the rash on the child's chest was easy to see. (T-pp. 38–39) Doctor DeAugustine indicated that he thought that Matthew had a bug bite on the hand (T-p. 40), but in fact there were no "bite marks" on the hand at all. (T-pp. 41, 201, 276) Doctor DeAugustine made a diagnosis of "cellulitis." (Cellulitis is an inflammation of soft supporting tissue under the skin.) Sgt. Denton brought back some antibiotic medication (Ampicillin) to be given orally, one teaspoon every six hours. (T-pp. 41–42) Instructions were given that the medication should be administered, the hand soaked in warm salt water three times a day for fifteen minutes, and the McNeills were told to bring Matthew back if he was not better. (T-p. 42) While in the Emergency Room, Mr. and Mrs. McNeill noted that the child's temperature on the digital readout thermometer was over 101°. (T-pp. 43, 74)

Mr. and Mrs. McNeill followed the prescribed regimen, but by the next morning, August 28th, Matthew still had fever, his hand had swollen more, and it felt warmer. There were still "splotches" on the youngster's chest. He was irritable and the affected hand with cellulitis continued to be sensitive. Mrs. McNeill called her husband at work from a neighbor's telephone, as they only had one car and lived in the country several miles from the Air Force Base. He drove home and they brought Matthew back to the Myrtle Beach Air Force Base Hospital Emergency Room. (T-pp. 43–44)

When Mr. and Mrs. McNeill returned to the Emergency Room they were seen again by Sgt. Denton who instructed them to take Matthew to the examining room. No instructions were given to undress the youngster, but they did show Sgt. Denton that the hand was more swollen. Doctor DeAugustine did not closely examine the child at all, he did no physical examination, but did ask why Matthew had been brought back. Mrs. McNeill responded to the effect that they had been instructed to bring him back in if he did not improve or if his condition worsened. As mentioned, Doctor DeAugustine made no examination, he did not instruct that the child be undressed, and he did not even direct that the youngster be placed on an examining table. Mrs. McNeill simply held Matthew in her arms, and Doctor DeAugustine stated, in effect, that the McNeills were abusing the Emergency Room, that they had not given the medicine sufficient time to work over a period of ten to fourteen days, and that the youngster should not have been brought back so soon. Mr. McNeill asked for a blood test of some type and Doctor DeAugustine informed him, in effect, that he was the doctor. Pointedly, no one examined or touched the child.[1] (T-pp. 45–47, 197–198)

The McNeills returned the youngster to their home where over the next few days there was no substantial change. The swelling on the hand went down some, but it stayed sore. The fever varied. (T-p. 202) The child was given the medication, although it appears that he did not receive a full dosage over the ten days to two weeks which ensued. This was attributable to the fact that the spoon was not filled up to the brim, and perhaps to the fact that the spoon

---

1. The Emergency Room records have been lost and no adverse inference is drawn therefrom. Both sides have so stipulated. Doctor DeAugustine has no recollection of ever seeing the child (T-p. 306), but does not deny that he came in professional contact with him. However, he does say that if he did see Matthew there could only have been one visit involving him as he did not ordinarily work in the Emergency Room two days in a row. (T-pp. 305–306) Moreover, the Government disputes that there were two Emergency Room visits at all; but it is clear that there were two visits as several Government witnesses recollect that from their having seen the records which were subsequently lost. (T-pp. 329, 387, 397) Of course, the McNeills so testified as well.

itself was less than 5 ml. in volume. (T-pp. 47–48, 151)

Matthew did not eat well during this intervening time, he was irritable, and the hand stayed sore. The swelling on the hand did diminish somewhat, but the blue-grayish discoloration continued for a period of time. Finally, not wanting to go back to the facility where she considered that she and her husband were berated and her infant son not treated properly, Mrs. McNeill took Matthew to a local civilian physician, Doctor Arthur Collins on September 18th. The hand was still a little sore at that point and a small amount of the bluish-grayness remained. . Matthew had an elevation in his temperature and was still showing some signs of lethargy and irritability which had persisted over the entire period in question. (T-pp. 49–50) Doctor Collins prescribed some medication and told the McNeills to call back if the child did not show some improvement. Improvement was manifested the next day (T-p. 52), but on the morning of September 20th, the youngster started getting "stiff." This occurred around 9:00 A.M. to 10:00 A.M., after Sgt. McNeill had gone to work. (T-p. 52) Matthew did not suffer from any convulsions (T-p. 110) but he was "stiff" and his eyes looked peculiar. He did not respond well when spoken to. As mentioned previously, Mrs. McNeill had to wait for a neighbor to return as there was no telephone for her to call her husband to come for them to go for medical care. She was finally able to reach Mr. McNeill around 11:30 A.M., at his lunch time, he arrived around noon, and they went straight to the Grand Strand Hospital. (T-pp. 53–54) A spinal tap was performed which revealed a very severe case of meningitis.[2] (T-p. 55) Matthew was then transported to Myrtle Beach Air Force Base Hospital and later transferred to the Charleston Naval Regional Medical Center. Matthew was comatose and was responsive only to the most painful stimulus. He stayed there approximately one week and while being transferred to the Medical University of South Carolina Hospital for evaluation and treatment he had a life threatening episode which required resuscitation. He remained at MUSC for approximately four to five weeks. He had some mild improvement, but the H-Flu meningitis has left him with brain damage and a crippled body. (T-pp. 55–58)

Matthew had additional hospitalizations and has been cared for by the parents and local medical personnel in Indiana where the parents returned after Mr. McNeill was discharged from the Air Force.

Matthew McNeill is profoundly retarded, although he was "normal" prior to the illness which befell him. His spine has become curved, and he exercises no effective control over his body. He is sent to therapy at a school for retarded children, but he must wear a diaper, and his vision and hearing is severely depressed · as well. However, he does look at lights, his eyes follow people, he responds to music and to his mother's voice. This makes him "happy." Speech therapy seems to help a little, and the youngster continues to grow physically. (T-pp. 62–66, 209) Matthew feels pain, but may not "understand" it. (T-p. 474) The child had a normal work and life expectancy prior to his illness. (T-p. 469)

The child's need for medical care will not diminish throughout his lifetime (T-p. 193), and the better treatment and care he receives, the greater the chances that he will have greater longevity. (T-p. 153)

The issue to be decided is whether the treatment and care which Matthew McNeill was afforded on August 27th and 28th, 1978, at the Myrtle Beach Air Force Base Hospital conformed to the applicable standard of care, and if it did not, whether the departure therefrom was a proximate cause of the severe and profound injuries which the youngster has and must endure for the rest of his days.

As might be expected, the issue of liability was strongly and vigorously contested,

2. This was later diagnosed as H-Flu meningitis. It was explained that this bacterial organism was in no way connected with the viral disorder commonly known as "flu." (T-pp. 137–138)

with both sides making able presentations. This leaves the Court faced with making a decision based only upon an interpretation of the testimony of the witnesses and the documents admitted into evidence.

William Arthur Davis, II, M.D., a specialist in infectious diseases, and an Assistant Professor of Medicine at Georgetown University in Washington, D.C., testified on behalf of the Plaintiff. In addition to his expertise in infectious diseases, Doctor Davis has spent over 7,000 hours manning emergency rooms in community hospitals. (T-p. 124)

When Doctor Davis was called to the stand, the government sought to invoke the so-called "locality rule" because Doctor Davis does not practice in Myrtle Beach, South Carolina. (T-p. 129) Doctor Davis indicated that the standard of care for physicians was the same throughout the United States in community hospital emergency rooms, although he was not familiar with the Myrtle Beach community.

██ There are no South Carolina Supreme Court cases directly and precisely in point; however, there is enough discussion from the South Carolina Supreme Court and other U. S. District Courts in the District of South Carolina to conclude that Doctor Davis' testimony on the issue of liability is and was admissible.

In *Green v. Lilliewood*, 272 S.C. 186, 192, 249 S.E.2d 910, 913 (1978), the South Carolina Supreme Court quoted favorably from *Jarboe v. Harting*, Ky., 397 S.W.2d 775 as follows:

> ... [E]xpert testimony is required in a malpractice case to show that the Defendant failed to conform to the required standard, which is, such reasonable and ordinary knowledge, skill and diligence as physicians in similar neighborhoods and surroundings ordinarily use under like circumstances...

The "similarly situated" rule is such that the expert brought in can state that he is familiar with the standards in accredited hospitals, and that they are or were the same throughout the United States with regard to the treatment of a particular disorder, then he ought to be able to say what the standard is, being allowed to explain, but of course being subject to cross-examination. That was the situation in *Rucker v. High Point Memorial Hospital*, 285 N.C. 519, 206 S.E.2d 196, 201 (1974). In *Callahan v. William Beaumont Hospital*, 400 Mich. 177, 254 N.W.2d 31 (1977), it was stated that the test of the qualification of a physician to testify in a malpractice case as an expert is whether he knows "standard of care about which he is to testify;" whether he has ever practiced in the Defendants' geographical area is irrelevant. To the same effect is *Dobson v. Mulcare*, 26 Md. App. 699, 338 A.2d 898 (1975). There it was held that it was not necessary to show that a physician practiced or resided in the particular geographical region in order to qualify him as an expert in an action involving negligent administration of tetanus toxoid injection.

The above is very similar to that which was held by Judge Hemphill in *Kapuschinsky v. United States*, 248 F.Supp. 732, 743–744 (D.S.C.1966). Judge Blatt agreed when he stated in *Phillips v. United States*, 508 F.Supp. 544, 550 (D.S.C.1981):

> As in any medical malpractice action, the physician is bound to the standard established by the skill and learning possessed by other members of his profession who are similarly situated.

See, also, 61 Am.Jur.2d *Physicians, etc.*, § 205.

The decision to follow this rule is buttressed by testimony of several different physicians for the Defendant who indicated that the standard of care was the same throughout the United States. This included Doctor DeAugustine (T-p. 311), Doctor Rigtrup (T-p. 344), Doctor McCracken (depo. p. 11), and Doctor Steele. (T-p. 416) Counsel for the government argued that the standard of care was lower in South Carolina. (T-p. 132) The Court rejects this argument.

██ Doctor Davis described several departures from the standard of care which emergency room physicians would owe their

patients under like circumstances in community hospitals. As to the first visit, Doctor DeAugustine did not adequately examine the patient. The signs and symptoms which were present mandated a much more complete physical examination. (T-pp. 135–136) Doctor Davis was of the opinion that the child had the H-Flu organism in his body at the time of that emergency room visit (T-p. 138), and the second departure was the failure of the physician to treat the cellulitis of the hand much more aggressively. (T-p. 139) He describes what should have been done, and Doctor Davis indicates that if the treating physician did not feel competent to handle this matter he should have obtained a consultation. The failure to obtain the consultation was also a departure from the standard of care. (T-p. 141) This is consistent with Judge Hemphill's findings in *Steeves v. United States*, 294 F.Supp. 446, 455 (D.S.C.1968).

Doctor Davis expressed the opinion that the same acts of negligence described above also occurred during the second emergency room visit, with the additional aggravating factor that the child was there under conditions of not having improved with the treatment which had been rendered.[3] (T-p. 141) Moreover, and it is very important in the context of what occurred, there was a departure from the standard of care when the parents were intimidated into not returning to the emergency room for a long period of time by Doctor DeAugustine telling them that they were abusing the emergency room. (T-p. 142) Doctor Davis was also of the opinion that these departures were the proximate cause in the child later developing the H-Flu meningitis from which he has suffered such lasting and profound loss and damage. (T-p. 144)

A substantial basis of the government's defense is that the child could not possibly have had the H-Flu bacteria in his system

as long as Doctor Davis said he did and that he necessarily must have contracted the H-Flu organism and the subsequent meningitis at some period of time long after the two emergency room visits. Doctor Davis' answer to that, which was sharply disputed by Defendant's experts,[4] but which the Court finds persuasive, is that the Ampicillin "suppressed" the organism for a period of time (T-p. 145) and in effect, there was a "partial treatment" by the Ampicillin which allowed the organism to fulminate much later than it ordinarily would. (T-p. 147) Doctor Davis expressed the opinion that aggressive treatment and care would have eradicated the bacteria in the child's bloodstream along with the developing meningeal seeding and would have prevented the subsequent development of the H-Flu meningitis. (T-pp. 147–148) In short, Doctor Davis indicated that the standard of care required that aggressive antibiotic therapy be instituted along with appropriate testing, with the signs and symptoms which the child had in the two emergency room visits, that the failure to do so was a departure from the standard of care and that this departure was a proximate cause of the fulminating meningitis which subsequently developed. (T-p. 149) Plaintiff has met the "most probable" standard in terms of negligence and proximate cause. See *Green v. Lilliewood, supra,* at 912.

The government also contended that the treatment and care offered in the Emergency Room did conform to that which was "customary." Of course, that is something to be considered, but it is not conclusive, as "conformity to custom is not in itself the exercise of care as a matter of law." 61 Am.Jur.2d *Physicians, etc.,* § 211, p. 343; *Kapuschinsky v. United States, supra,* at 747.

Taking all of the evidence and arguments into account, and carefully weighing same,

---

3. Doctor DeAugustine admitted that when a patient returned within 24 hours, with no improvement, that the standard of care mandated a referral. (T-p. 314)

4. The Defendant's experts expressed the opinion that this was unlikely, but did concede that

this was "possible." (T-pp. 409, 499) Doctor Rigtrup said, as well, that it was "possible" that vigorous antibiotic therapy for the cellulitis would have kept Matthew from contracting the H-Flu meningitis. (T-p. 358)

it is concluded that the government is liable for Matthew McNeill's severe injuries and damages.

■ With a finding of liability, attention must be turned to the issue of damages. The various aspects of this issue will be discussed separately so that the Court's thinking on this difficult and weighty matter can be better understood.

Pain and suffering, past and future, is a traditional element of damages in an action of this type. Despite the child's severe brain damage, it is clear that he does and will endure great pain and suffering. Considering its magnitude in this instance, The Court finds that $175,000.00 is an appropriate sum for this aspect of the damages.

All of the pertinent testimony was consistent with the notion that Matthew McNeill has a shortened life expectancy. No one ventured to predict a finite period of longevity as one might do with a patient who is terminally ill. However, there was agreement that the child had a normal life expectancy at the time he was injured and now it has been severely curtailed as a result of his bout with H-Flu meningitis. There was a wide range of testimony in connection as to what the "possible" life expectancy of the child might be, and for purposes of quantifying the damages here, it is concluded that Matthew will live to at least reach his eighteenth birthday. It is apparent from viewing Mrs. McNeill and the videotape taken in the McNeill home that she is absolutely devoted to maintaining Matthew's health and welfare.

■ The deprivation of a normal life expectancy is a necessary and proper element of damages. *Sox v. United States*, 187 F.Supp. 465, 469 (E.D.S.C.1960). The view that this is a proper element of damages is not unanimous, 25 C.J.S. *Damages* § 56, p. 810, but the rule expressed by Judge Wyche in *Sox* seems the more appropriate.

There are no direct expressions on this issue by the South Carolina Supreme Court, but the position that shortened life expectancy may be viewed as a separate element of damages is often referred to as the "English Rule." See *Anno.* 97 A.L.R. 823 (1935); *Flint v. Lovell*, 1 K.B. 354, 97 A.L.R. 815 (1935); & *Wise v. Kaye*, 1 Q.B. 638 (1962). Under § 14–1–50, S.C.Code, 1976, the Common Law of England shall continue in effect in this state unless it is altered by the Code or is inconsistent with the Constitution or laws of this state. Accordingly, taking into account Judge Wyche's holding in *Sox, supra*, which was a controversy arising in South Carolina; viewing the English Common Law Rule which may be construed as being part of the law of South Carolina; and being of the opinion that if the South Carolina Supreme Court was to rule on this matter, that court would agree with the holding by Judge Wyche, I conclude that *Sox* correctly states the rule in this state on this aspect of damages.

The appropriate amount for the deprivation of normal life expectancy in this instance is $90,000.00.

■ After important consideration is that of placing a monetary sum on the permanent bodily impairment or disability, this to include compensation for the bodily impairment or disability *per se*, and for the nonpecuniary, non-pain aspects of Matthew's disabled condition, such as his being deprived of an opportunity to enjoy life which, of course, is a great part of that which makes life worthwhile, and the deprivation of his opportunity to pursue non-economic hobbies and recreation. *Isgett v. Seaboard Coastline Ry.*, 332 F.Supp. 1127, 1143 (D.S.C.1971); *Steeves v. United States*, 294 F.Supp. 446, 457, 458 (D.S.C.1968); *Shebester, Inc. v. Ford*, 361 P.2d 200, 202–204 (Okl.1961); *Cronenberg v. United States*, 123 F.Supp. 693, 703 (E.D.N.C.1954); and *Kisor v. Tulsa Rendering Co.*, 113 F.Supp. 10, 19 (W.D.Ark.1953).

In *Wise v. Kaye*, 1 Q.B. 638, 652 (1962), where the Plaintiff was rendered comatose as a result of brain injuries, the court observed:

At common law, in assessing damages for physical injuries, consideration has also been given expressly in recent times and perhaps at all times to what have been called loss of amenities. This is separate and distinct from pain and suffering...

See also *Anno.* 15 A.L.R.3d 506 (1967). This annotation discusses the loss of enjoyment of life as a separate element or factor in determining damages for bodily injury.

In *Frankel v. United States*, 321 F.Supp. 1331 (E.D.Pa.1970), aff'd. 466 F.2d 1226 (3rd Cir. 1972), the court observed that the Plaintiff there had lost "almost every enjoyment life can offer." 321 F.Supp. at 1339. Here the Plaintiff has lost *all* enjoyment of life. Accordingly, it is considered that $100,000.00 should be allocated to the loss of enjoyment of his life.

The next element of damages to consider is the present value of the child's lost earning capacity. Oliver G. Wood, Ph.D., an economist, projected that the present value of Matthew's lost earning capacity, using the minimum wage as the benchmark, was $368,175.00. (T-p. 21)

The government argues that the child will probably not be alive during the work life Doctor Wood projects, ages 20 through 60, and to favorably consider this on behalf of the Plaintiff would not be proper.

■ First of all, it is irrelevant that the Plaintiff, now 3½ years old, is unable to show a history of earnings on which to base his claim or that he is or was unemployed at the time of his injury. The important consideration is that prior to the injury about which complaint is made Matthew had a full and complete earning capacity. This has been utterly destroyed, and he is entitled to be compensated for this entire loss. See *Matthews v. Porter*, 239 S.C. 620, 124 S.E.2d 321, 328 (1962); *Doremus v. Atlantic Coast Line Ry.*, 242 S.C. 123, 130 S.E.2d 370, 382 (1963); and *Steeves v. United States, supra,* at 456–457. As was stated cogently in *Downie v. United States Lines Co.*, 359 F.2d 344, 347 (3rd Cir. 1966) *cert. den.*, 385 U.S. 897, 87 S.Ct. 201, 17 L.Ed.2d 130:

> Damages resulting from the impairment of earning capacity and the probable loss of earnings must be measured on the basis of life expectancy at the time of injury. The award must be based upon the probable pecuniary loss reduced to its present net worth. The same rules

should be applied where, as here, an element of the permanent injury is the consequent curtailment of the (Plaintiff's) . . . life expectancy. (Citations omitted.)

See also, 22 Am.Jur.2d *Damages* § 92, n. 14, pp. 134–135; 25 C.J.S. *Damages* § 81, p. 902.

It would not be just to reduce damages for the impairment of earning capacity when the Plaintiff's life expectancy has been reduced by the acts or omissions of the Defendant.

For these reasons, it is concluded that the present value of Matthew McNeill's earning capacity is $368,175.00, and he should receive that amount for this aspect of his damages.

■ The issue of Matthew being able to collect for his own medical expenses was hotly contested. The reason for this is that Mr. and Mrs. McNeill have not filed suit, and the time when suit could be filed is past.

Medical expenses on behalf of a child are usually included in a parent's cause of action. *Tucker v. Buffalo Mills*, 76 S.C. 539, 542, 57 S.E. 626, 121 Am.St.Rep. 957 (1907); *Hughey v. Ausborn*, 249 S.C. 470, 154 S.E.2d 839, 841 (1967); and *Kapuschinsky v. United States*, 259 F.Supp. 1, 7 (D.S.C.1966). However, this general rule is not an absolute bar, as when the parents do not assert a claim, or have waived a claim for these expenses. 67A C.J.S. *Parent and Child* § 142, p. 526. Suppose both parents had died? Would the claim for medical expenses be lost? Surely it would inhere in the child, and he would be responsible to pay for his own necessary expenses from his own assets. The important point is that two claims cannot be asserted for the same item of damages.

Judge Wyche recognized this in *Sox v. United States*, 187 F.Supp. 465, 469–470 (1960):

> At the close of the government's defense, the government called to the attention of the Court that general releases were

obtained from the mother and father in the settlement of suits brought for them. The records show that these cases were brought on behalf of the parents to recover damages only for the personal injuries sustained by them and in no way involved any claim arising by reason of injury to their then unborn infant daughter. It also appears that more than two years have expired since the accident so that any claim arising by reason of injury to the infant that either parent might have had is now barred by the provisions of 28 U.S.C.A. § 240(b). * * * It is settled law that the primary right of recovery for the cost of medical and nursing care of an injured infant lies with the parents, but it is equally well settled that this right may be waived in favor of a recovery by the infant. The underlying reason for these rules is to prevent double recoveries. It is not to excuse liability. By not asserting within the two-year statutory period any right that they may have had to recover for such cost, the parents have absolutely and irrevocably waived any right that they may have had in that respect. This does not, however, bar the infant nor does it excuse liability.

See, also, *Anno.* 37 A.L.R. 64. As noted in *Anno.* 32 A.L.R.2d 1060, 1083:

> The right of parents to recover such items of damage as loss of earnings or medical expenses on account of injuries to their minor child has been held in a number of the later cases to have been lost through the estoppel of the parents, or through a waiver or relinquishment of such right, sometimes resulting from emancipation.

> As mentioned in the original annotation, no reason has been suggested why a parent may not thus release to the child his right to items of damage.

Having found that Matthew McNeill is authorized to assert his own claim for medical expenses in the absence of one being asserted by the parents, consideration must be given to the amount.

The testimony established a before trial loss of $8,592.00 for medical expenses. This included therapy, special schooling, medical treatment and transportation for medical treatment. This is itemized in detail on Plaintiff's Exhibit 2.

The present value of after trial losses, as testified to by the parents and Doctor Wood, has been divided into two categories. If Matthew stays at home and survives to age eighteen, then the present value of his care will be $196,599.00. If he is institutionalized for that period the total care will amount to $311,923.00.

Mrs. McNeill has testified that she prefers to keep her son at home, but if he became unmanageable as he grows, she would be compelled to institutionalize him in a special home. Trying to take both contingencies reasonably into account, it is concluded that $250,000.00 would be an appropriate sum for this part of the damages.

Accordingly, the damages can be summarized as follows:

| | | |
|---|---|---:|
| (a) | Pain and Suffering | $175,000.00 |
| (b) | Deprivation of Normal Life Expectancy | 90,000.00 |
| (c) | Disabled Condition-Loss of Enjoyment of Life | 100,000.00 |
| (d) | Lost Earning Capacity | 368,175.00 |
| (e) | Pre-Trial Medical Expenses | 8,592.00 |
| (f) | Post-Trial Medical Expenses | 250,000.00 |
| | | $991,767.00 |

The Clerk will, therefore, enter judgment for Plaintiff in the sum of $991,767.00, plus the costs of this action.

IT IS SO ORDERED.