**Jerilyn KARDOS, Executrix of the Estate of Rae H. Quinn, and Jerilyn Kardos, Individually, Plaintiffs Below, Appellants,**

v.

**Scott HARRISON, D.O., Defendant Below, Appellee.**

No. 149, 2009.

Supreme Court of Delaware.

Submitted: Aug. 19, 2009.

Decided: Sept. 4, 2009.

---

Kenneth M. Roseman, Esquire, Kenneth Roseman, P.A., Wilmington, DE, for appellants.

Gary W. Alderson, Esquire, and John A. Elzufon, Esquire, Elzufon, Austin, Reardon, Tarlov & Mondell, P.A., Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

HOLLAND, Justice:

The plaintiff-appellant, Jerilyn Kardos, individually and as executrix of the estate of Rae H. Quinn (the "Decedent"), appeals from the Superior Court's grant of judgment as a matter of law in favor of the defendant-appellee, Scott Harrison, D.O. The basis for the Superior Court's decision was the failure of the plaintiff to prove causation. Kardos contends that the Superior Court committed legal error by dismissing her claim due to the absence of expert testimony establishing the precise statistical percentage of the Decedent's lost chance of survival. The record reflects, however, that the dismissal was granted for a different reason. The Superior Court properly held the plaintiff failed to prove, through expert testimony with reasonable medical probability, that Dr. Harrison's alleged negligence caused any lost chance of survival. Therefore, the judgment of the Superior Court must be affirmed.

### Facts

The Decedent developed endometrial cancer in 2002. On March 27, 2002, James Larson, M.D., a board-certified gynecological oncologist, began treating her for that cancer. The Decedent subsequently had surgery and radiation treatment for that cancer, after which Dr. Larson believed her to be cancer-free. Dr. Larson discharged the Decedent in 2004.

The Decedent had a CT scan of her lungs on December 21, 2005. The scan revealed the presence of three masses,

which Dr. Larson testified were suspicious of cancer. However, the report by the radiologist examining the scan indicated that the scan was normal for the Decedent's age and without indication of cancer. Dr. Harrison, the Decedent's primary care physician, received a copy of this report. Dr. Harrison did not send the Decedent for any follow-up treatment after the scan.

The Decedent had a second CT scan of her lungs on December 21, 2006, and a third on January 29, 2007. The scans revealed that all three of the previously identified lung masses had increased in size. A subsequent lung biopsy was positive for adenocarcinoma—a recurrence of her earlier endometrial cancer. A February 16, 2007, CT scan of the Decedent's brain showed metastasis—that the cancer had spread to the Decedent's brain.

Dr. Larson began treating the Decedent again on February 22, 2007, with chemotherapy and radiation. Although he initially discharged her in 2004, Dr. Larson testified at trial that, based upon subsequent events, he now believes that the Decedent's cancer had already metastasized to her lungs and most likely her brain in 2002. The Decedent died as a result of her cancer on May 27, 2007.

### Complaint

Kardos filed a timely wrongful death/survival action against Dr. Harrison. The complaint alleged that Dr. Harrison violated the standard of care by failing to refer the Decedent for a biopsy or follow-up after the malignant lesions were first revealed from the 2005 CT scan. The complaint further alleged that the Decedent suffered a lost chance of survival as a consequence of Dr. Harrison's negligence. The case was scheduled for trial on March 2, 2009.

### Case Dismissed

Dr. Larson, Kardos's sole expert on causation, was unavailable for trial. Therefore, his trial testimony was taken by videotaped deposition on February 20, 2009. As a result of this testimony, Dr. Harrison moved for judgment as a matter of law. The trial judge granted Dr. Harrison's motion and the trial was cancelled.

The trial judge reasoned that Kardos was unable to prevail because "[a]t no point was the doctor ever able to say ... what percentage or what Ms. Quinn would have been able to—would have responded positively and how it would have benefited her and he was not able to, as a result, link the alleged negligence of Dr. Harrison to the ultimate death of Ms. Quinn. In other words, if Dr. Harrison had started therapy in December of 2005, he could not say that that therapy would have made any change and he called any effort to do so speculative."

### Standard of Review

██ This Court reviews *de novo* the Superior Court's decision to grant judgment as a matter of law.[1] Kardos contends that the Superior Court committed legal error by holding that she was required to present statistically precise evidence of the Decedent's lost chance of survival. She argues that Dr. Larson's testimony was sufficient to show that the Decedent's chance of survival was reduced as a consequence of Dr. Harrison's negligence.

██ To grant judgment as a matter of law on a particular issue, the trial court must find that "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."[2] On appeal, we must determine "whether

---

1. *Brown v. Liberty Mut. Ins. Co.*, 774 A.2d 232, 245 (Del.2001).

2. Del.Super. Ct. Civ. R. 50(a); *Brown v. Liberty Mut. Ins. Co.*, 774 A.2d at 245.

the evidence and all reasonable inferences that can be drawn therefrom, taken in the light most favorable to the nonmoving party, raise an issue of material fact for consideration by the jury." [3]

### Loss of Chance

■■■ We adopted the doctrine of loss of chance of survival in *United States v. Anderson.*[4] This doctrine permits a plaintiff to recover damages for the diminution of that person's chance of survival, where that diminution was caused by the negligence of a defendant, even though the person already had a greater than fifty percent probability of not surviving.[5] An important distinction is that "[i]f an injury is suffered in the loss of chance situation, it is the reduced possibility of survival which is the basis of the claim, not the death itself." [6]

In *Anderson*, we explained that the purpose behind the doctrine of loss of chance of survival was both to compensate inno-cent victims of negligence and to prevent tortfeasors from "get[ting] off scot-free because instead of killing his victim outright he inflicts an injury that is likely though not certain to shorten the victim's life." [7] We did not hold that a plaintiff must present evidence of the precise statistical percentage of the lost chance of survival. Instead, we held that it was sufficient for the plaintiff to show that the chance of survival was reduced as a consequence of the defendant's negligence.[8]

### Expert Testimony

■■■ Pursuant to title 18, section 6853 of the Delaware Code,[9] plaintiffs bringing medical malpractice claims "must produce expert medical testimony that specifies: (1) the applicable standard of care; (2) the alleged deviation from that standard; and (3) the causal link between that deviation and the alleged injury." [10] An expert must testify to a reasonable medical probability as to each of these elements.[11] In this

---

**3.** *Russell v. Kanaga,* 571 A.2d 724, 731 (Del. 1990); *see Porter v. Turner,* 954 A.2d 308, 312 (Del.2008) (quoting *Burkett–Wood v. Haines,* 906 A.2d 756, 762 (Del.2006)).

**4.** *United States v. Anderson,* 669 A.2d 73 (Del. 1995).

**5.** *United States v. Cumberbatch,* 647 A.2d 1098, 1099 (Del.1994).

**6.** *Id.* at 1103.

**7.** *United States v. Anderson,* 669 A.2d at 78 (quoting *DePass v. United States,* 721 F.2d 203, 208 (7th Cir.1983) (Posner, J. dissenting)).

**8.** *Id.* ("Compensating a tort victim for an increase in risk which results from some harm caused by a tortfeasor fits comfortably within traditional damage calculation methods. Plaintiff's life expectancy has been shortened because he has a higher risk of death from testicular cancer. Accordingly, he should be compensated.") (citation omitted).

**9.** Del.Code Ann. tit. 18, § 6853 (Supp.2008). Section 6853(e) provides, in pertinent part:

No liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death.... Except as otherwise provided herein, there shall be no inference or presumption of negligence on the part of a health care provider.

**10.** *Green v. Weiner,* 766 A.2d 492, 494–95 (Del.2001) (citing *Russell v. Kanaga,* 571 A.2d 724 (Del.1990)); *see Froio v. Du Pont Hosp. for Children,* 816 A.2d 784, 786 (Del.2003). Section 6853 was amended subsequent to these decisions; however, the pertinent text remains the same, now appearing in subdivision (e). 74 Del. Laws ch. 148, § 1 (2003).

**11.** *See Floray v. State,* 720 A.2d 1132, 1136 (Del.1998) ("Generally when an expert offers a medical opinion it should be stated in terms of 'a reasonable medical probability' or 'a reasonable medical certainty.' ") (citing *Oxendine v. State,* 528 A.2d 870, 873 (Del.1987)); *Money v. Manville Corp. Asbestos Disease Comp. Trust Fund,* 596 A.2d 1372, 1377 (Del.

case, Kardos failed to satisfy the reasonable medical probability standard.

On direct examination, Dr. Larson testified that "thirty percent of patients [who, like the Decedent, have] recurrent endometrial cancer will respond to treatment" and that "a portion of those will have an extended life, with lung metastasis." But, he conceded that "[m]ost people with metastatic endometrial cancer either die with their disease or because of their disease." [12] On redirect examination, Dr. Larson further explained that the thirty percent statistic would apply to the Decedent; but that, due to Dr. Harrison's late referral, she had not been on the treatment long enough to determine whether she would respond to the treatment.[13]

On cross-examination, Dr. Larson testified that any attempt to connect the general increased chance of survival of patients with recurrent endometrial cancer with the Decedent was merely speculation. Thus, he was unable to testify with reasonable medical probability "whether earlier intervention would have increased the chance of her having a better outcome." [14] He con-

1991); *cf. Perkins v. State,* 920 A.2d 391, 394–95 (Del.2007) (holding that medical examiner must testify to either a "reasonable medical probability" or a "reasonable medical certainty" as to the cause of death in a homicide case).

**12.** Dr. Larson's testimony on direct examination was as follows:

Q: Doctor, have you also testified previously and is it your opinion that, in general, 30 percent of patients with recurrent endometrial cancer will respond to treatment and have an extended life expectancy?

A: That 30 percent of people will respond to treatment. A portion of those will have an extended life, with lung metastasis.

Q: Have you also testified previously and is it your opinion that patients with endometrial lesions in the lung and who do respond to treatment can survive for years and that they will die from other causes?

A: I've had people that I've treated for years that they have died from other causes from that. Most people with metastatic endometrial cancer either die with their disease or because of their disease.

**13.** Dr. Larson's testimony on redirect was as follows:

Q: Doctor, how long does a patient need before you know whether or not that patient is responding to the therapy?

A: Usually for hormonal agents they need to be on for two or three months in order to decide whether or not they are going to respond to that.

Q: And again, what you told us earlier is that approximately 30 percent of the patients do respond to that hormonal therapy, and do have an extended life expectancy?

A: They do respond, and then a portion of those will have an extended life.

Q: And that statistic would also apply to Rae Quinn as well?

A: Yes.

Q: And again, it was your opinion that Mrs. Quinn died before she had the opportunity to respond to the hormonal therapy?

A: Yes. She had not been on long enough to decide.

Q: And the amount of time she would have needed to survive and determine whether she was responding to the hormonal therapy was only approximately two or three months?

A: That's correct.

Q: And again, these are opinions that you are able to state to a reasonable degree of medial probability?

A: Yes.

**14.** Dr. Larson's testimony on cross-examination was as follows:

Q: Are you able to state in terms of reasonable medical probability that it is more likely than not that your involvement a year earlier ... would have increased her life expectancy?

A: I don't know whether her life expectancy would have been any different....

* * *

Q: Are you able to tell us whether or not responding earlier would have increased her chance of having a different outcome, or don't you know that either?

A: No. As we said, smaller lesions generally respond better.

Q: But what about Rae Quinn?

A: Speculating, people that have smaller lesions, they statistically are going to respond better.

firmed on recross-examination that whether the Decedent lost a chance of survival or a prolonged life was speculation "because she was not [alive] long enough to know whether she would have responded or not." Dr. Larson testified as follows:

> Q: If I may, you said that about 30 percent respond and there is a subset of that. I didn't quite get that. I apologize.
>
> A: No. That people when they respond, they can respond by either [the] tumor being smaller or [ ] disappearing. Okay. Of those, those people, some of those people are going to benefit by having prolonged, but not all of that 30 percent are going to have that long period of time.
>
> Q: Okay, so we are back to where we started from. As to Rae Quinn herself, is it all a matter of speculation?
>
> A: That's correct, because she was not [alive] long enough to know whether she would have responded or not.

Although Dr. Larson testified that thirty percent of patients like the Decedent respond to treatment, and of those thirty percent, an unknown portion live a prolonged life, this statistic is not sufficient to connect any lost chance of survival with Dr. Harrison's negligence, because Dr. Larson also testified that he could only speculate whether earlier intervention would have increased her chances of falling within the zero to thirty percent of patients who live a prolonged life. Moreover, he explained that a cure was unlikely after the cancer had metastasized, which

> * * *
> Q: ... As to Rae Quinn, this particular patient, not the general population, but this particular patient, are you able to tell us, yes, no, or I don't know, whether earlier intervention would have increased the chance of her having a better outcome?

he testified had likely occurred before the 2005 scan.

The Superior Court did not dismiss this case because the plaintiff failed to present expert testimony establishing the precise percentage of the Decedent's loss of chance. The Superior Court dismissed the case because the plaintiff's only evidence on causation was, by her own expert's admission, speculative. Consequently, the plaintiff failed to make a *prima facie* case on the issue of causation.

Dr. Larson was unable to state with reasonable medical probability whether Dr. Harrison's failure to refer the Decedent to an oncologist in a timely manner had caused her lost chance of survival. Accordingly, Kardos failed to prove causation, an element of her case on which she carried the burden of proof.[15] Therefore, we hold that the trial judge did not err in granting judgment as a matter of law for Dr. Harrison.

### *Conclusion*

The judgment of the Superior Court is affirmed.

> A: All I could do is speculate....

**15.** *Burkhart v. Davies,* 602 A.2d 56, 60 (Del. 1991) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).