Rosalie FROIO, Individually and as Administratrix of the Estate of Samantha Latigona, a deceased minor, Plaintiff Below, Appellant,

v.

Du PONT HOSPITAL FOR CHILDREN, a/k/a A.I. Du Pont Institute of the Nemours Foundation, Defendant Below, Appellee.

No. 378, 2001.

Supreme Court of Delaware.

Submitted: Nov. 26, 2002.
Decided: Feb. 21, 2003.
Revised: March 10, 2003.

Joseph M. Jachetti, Esquire, of Law Offices of Joseph Jachetti, Wilmington, Delaware, and Michael J. Troiani, Esquire (argued), of Dubin, Stein & Troiani, Bala Cynwyd, Pennsylvania, for Appellant.

M. Duncan Grant, Esquire, of Pepper Hamilton, LLP, Wilmington, Delaware, Andrew Rogoff, Esquire (argued) and Nancy Shane Rappaport, Esquire, of Pepper Hamilton, LLP, Philadelphia, Pennsylvania, for Appellees.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

BERGER, Justice.

In this appeal we consider whether the Superior Court erred in granting summary judgment to appellee in a medical malpractice case. The trial court found that the deposition of appellant's expert failed to establish either causation or that appellee breached the applicable standard of care. We disagree. Although the expert gave arguably inconsistent responses to different questions, the deposition provides the factual basis for appellant's claim. Accordingly, appellant should be allowed to go to trial.

Factual and Procedural Background

Samantha Latigona was born in 1989 with a rare genetic disease, metachromatic leukodystrophy (MLD), which causes progressive paralysis and leads to death within a few years. In 1997, Samantha's mother, Rosalie Froio, brought Samantha to the du Pont Hospital for Children ("Nemours") for treatment of scoliosis, or curvature of the spine, caused by the MLD. Drs. Kirk Dabney and Stephen Ludwig performed a spinal fusion to straighten Samantha's spine. During the surgery, a warming blanket called a "Bair Hugger," was placed over Samantha's legs and feet to prevent hypothermia and to promote proper blood circulation. When the surgery was completed and the Bair Hugger was removed, the doctors discovered that the Bair Hugger had inflicted first and second degree burns on Samantha's feet. Samantha died on December 31, 1998. Her death was unrelated to the surgery.

In her complaint, Froio alleges that Nemours failed to properly use, monitor, or test the Bair Hugger. Froio attempted to support those allegations with the report and deposition testimony of Dr. Maria Zestos. In her report, Zestos identified several factors that "may" have contributed to Samantha's burns: (1) improper positioning during the surgery, which could cause compromised blood flow and would increase the risk of burns; (2) hypotension, or low blood pressure, which occurred for two ½ hour intervals during the 6-hour operation; (3) direct pressure contact with the Bair Hugger; (4) a hole in the Bair Hugger; (5) external pressure on Samantha's legs (as from surgical instruments); and (6) other sources of heat, such as hot blankets or a heating lamp. Zestos concluded her report:

In summary, Samantha Latigona most probably experienced some degree of decreased perfusion and ischemia [decreased blood flow] to her lower extremities. This is supported by the cyanosis of her toes.... This was most likely caused by poor positioning with compromised blood flow and venous return, or by significant periods of hypotension during the operation. This ischemia may have predisposed Samantha to second-degree burns despite appropriate setting and functioning of the Bair Hugger. Direct contact pressure injury may also have contributed to the dorsal surface burns. My above findings constitute a deviation in the standard of care of Samantha Latigona resulting in the second-degree burns. All of my opinions are to a reasonable degree of medical certainty.

In her deposition, Zestos opined that patient positioning, exacerbated by hypotension, was the cause of Samantha's burns. She explained that, in her report, she set forth all the possible causes and then settled on these causes based on the medical records. When pressed about her theory that Samantha had been placed in the wrong size frame, or that she had not been properly positioned in the frame, Zestos stated:

F. * * *

You are absolutely right, it is not standard of care to check the feet in the middle of surgery; however, if the patient's underlying disease prevents you from appropriately positioning them, then your care needs to be more compulsive.

Q. What would that include?

A. Checking her feet.

Q. Could you check her feet during surgery?

A. We routinely check the feet during surgery when they are doing a wake up test. A lot of times they wake up kids in the middle of a procedure to make sure that they can wiggle their toes and that they don't have spinal cord injury. So you can get to the feet.

Q. In this type of surgery?

A. Scoliosis surgery.

Q. The type of surgery that Samantha underwent?

A. Correct....

Later in her deposition, Zestos gave a somewhat contradictory response:

Q. Do you find that any of the professionals at duPont failed to properly assess the child's condition during surgery?

A. The condition of her lower extremities was not assessed.

* * *

Q. Have you done it in the kind of surgery as was done in this case?

A. If there is indication to, yes. Most of the time it is not indicated.

Q. Is there any indication that it should have been done here?

A. Only with the—

Q. 20/20 hindsight?

A.—20/20 hindsight.

The trial court granted Nemours' motion for summary judgment, finding no "clear statement of what the doctor should have done differently." This appeal followed.

### Discussion

■ By statute, a plaintiff bringing a medical malpractice claim such as this one must be able to support that claim with expert medical testimony:

No liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death.... [1]

"[T]he production of expert medical testimony is an essential element of a plaintiff's medical malpractice case and . . . is an element on which he or she bears the burden of proof." [2] Thus, a defendant is entitled to summary judgment if, after adequate time for discovery, "the record unambiguously reflects that the plaintiff's allegations are not and will not be supported by any expert medical testimony...." [3]

■ The record here, viewed in the light most favorable to Froio, provides the basics of her malpractice claim: applicable standard of care, breach of that standard of care, and injury caused by the breach. Zestos opined that, to meet the standard of care when performing surgery to correct scoliosis on a patient whose other medical conditions prevent appropriate positioning, a doctor must periodically check under the Bair Hugger to be sure it is not burning the patient's legs or feet. Zestos also opined that Samantha was not appropriately positioned during the surgery. The Nemours doctors did not check under

1. 18 *Del. C.* § 6853.

2. *Burkhart v. Davies,* 602 A.2d 56, 59 (Del. 1991).

3. *Id.* at 60.

the Bair Hugger and, as a result, Samantha was injured.

We are aware that, at times during the deposition, Zestos seemed to contradict herself. But she did not, as Nemours argues, repudiate her opinion. Throughout the deposition, Zestos maintained that Samantha's burns were caused by poor positioning and ischemia. She also was consistent for the proposition that the burns could have been avoided if Samantha's legs were checked periodically during the surgery. Zestos equivocated on the question of whether the Nemours doctors should have known that Samantha needed that extra level of care. But we must view her testimony in the light most favorable to Froio.[4] In so doing, we conclude that the record is adequate to defeat Nemours' motion for summary judgment.

## Conclusion

Based on the foregoing, the judgment of the Superior Court is REVERSED and this matter is REMANDED for further action. Jurisdiction is not retained.

4. *Telxon Corp. v. Meyerson,* 802 A.2d 257 (Del. 2002).