Barbara A. MAMMARELLA, Plaintiff–Below, Appellant,

v.

Alan B. EVANTASH, M.D., All About Women of Christiana Care, Inc., and Christine W. Maynard, M.D., Defendants–Below, Appellees.

No. 548, 2013.

Supreme Court of Delaware.

Submitted: April 16, 2014.

Decided: May 15, 2014.

**630**

Ben T. Castle, Esquire, Hudson & Castle Law LLC, for Appellant Barbara A. Mammarella.

Dennis D. Ferri, Esquire, and Allyson Britton DiRocco, Esquire, Morris James LLP, for Appellee Alan B. Evantash, M.D.

Andy E. Vernick, Esquire, and Ryan T. Keating, Esquire, Wharton Levin Ehrmantraut & Klein, P.A., for Appellees All About Women of Christiana Care, Inc. and Christine W. Maynard, M.D.

Before STRINE, Chief Justice, HOLLAND, and JACOBS, Justices.

STRINE, Chief Justice:

## I. INTRODUCTION

Barbara A. Mammarella sued her radiologist, Alan B. Evantash, M.D., her OB/GYN, Christine M. Maynard, M.D., and All About Women of Christiana Care, Inc. (collectively, the "Healthcare Providers") for medical malpractice. To establish her claim, Mammarella needed to present expert testimony that could support a jury verdict that the alleged negligence, which was a six-month delay in her breast cancer diagnosis, was the proximate cause of her injury, which was an alleged change in treatment that required Mammarella to undergo chemotherapy. But the testimony of Mammarella's sole medical expert on causation, Dr. David Biggs, could not support a jury verdict because Dr. Biggs did not testify to a reasonable degree of medical probability that Mammarella's treatment options had changed as a result of the alleged negligence. Therefore, the Superior Court's determination that no reasonable jury could find in favor of Mammarella on the issue of medical causation was correct, and the Superior Court's grant of judgment as a matter of law is affirmed.

## II. BACKGROUND [1]

During an annual screening mammogram on October 13, 2009, Dr. Kristina Siddall, a radiologist, noticed two nodules in Mammarella's breast, each 6 millimeters in dimension, and recommended a follow-up screening. Later evidence established that there was, in fact, only one nodule. A second radiologist, Dr. Alan B. Evantash, performed the follow-up screening on October 16, 2009. Dr. Evantash told Mammarella that there was "[n]o evidence of malignancy" and that she should return for another mammogram in one year. A copy of Dr. Evantash's report was sent to Dr. Christine M. Maynard, Mammarella's OB/GYN, who called Mammarella on October 20, 2009 to discuss the results. During the phone call, Mammarella indicated that she was not comfortable with waiting a full year before the next screening, so Dr. Maynard scheduled another mammogram in six months. That ·follow up screening occurred on April 22, 2010, and revealed that the nodule had grown to 8 millimeters. Dr. Emily Penman, a surgeon, performed a biopsy on May 7, 2010, determined that the nodule was malignant, and diagnosed Mammarella with breast cancer.

On May 13, 2010, Mammarella met with a breast cancer multi-disciplinary team that included Drs. Penman and Biggs, among others, to discuss treatment options. At the time of this meeting, Mammarella's breast cancer stage was unknown pending further testing. Dr. Penman recommended a lumpectomy to remove the tumor. Mammarella's claim is premised on her contention that Dr. Biggs told her that day that she would be eligible to have radiation treatment if the tumor was 8 millimeters or less in size. In other words, Mammarella testified that Dr. Biggs led her to understand that she would need both radiation and chemotherapy if her tumor, when removed, was larger than 8 millimeters, but that she would need only radiation and not chemotherapy if her tumor was 8 millimeters or less. Dr. Biggs later testified that Mammarella's understanding was not accurate and that he was only trying to provide her with a general framework about possible treatment options, not a specific treatment recommendation that could be determined solely by the size of the tumor.[2]

Dr. Penman performed the lumpectomy and removed the tumor on May 27, 2010. The tumor was determined to be 11 millimeters at its largest dimension. Dr. Biggs diagnosed Mammarella with Stage I, Grade III breast cancer and recommended that she undergo twelve weeks of chemotherapy.[3] Mammarella claims that chemo-

---

1. These facts are drawn from the record below and are not disputed by the parties.

2. B–43 (Biggs Trial Dep.), Tr. 29:6–11 ("[M]y goal in that initial meeting [was] to try to provide a general framework for understanding how we make decisions, and so that was my goal. If that came across as being very specific, that was unintentional."); B–44 (Biggs Trial Dep.), Tr. 33:20–24 ("Q. So any discussions you had with a patient prior to that June 8th, 2010 consultation would have been in tentative or speculative terms. Is that fair to say? A. Yes, correct."); BB069 (Biggs Disc. Dep.), Tr. 60:5–10 ("[I]t's dangerous to make definitive statements about what you would or wouldn't do based on imaging. We really need to know what it is. And so the consultation that we had prior to her surgery was—Q. Tentative? A.—hypothetical.").

3. It was also recommended that Mammarella undergo localized breast radiation therapy following chemotherapy, but she never received radiation therapy. Mammarella tested positive for a genetic mutation that increases the risk of recurrence of breast cancer and elected to undergo prophylactic bilateral mastectomies (complete removal of both breasts). As a result, no radiation was needed. The bilateral mastectomies are unrelated to the medical negligence claim that we now consider.

therapy is more disfiguring, disabling, painful, and fatiguing than radiation.[4] Mammarella testified that she suffered greatly as a result of the chemotherapy, by experiencing symptoms including hair and fingernail loss, severe aches and pains, nausea, headaches, fatigue, sleeplessness, dry mouth, sore throat, and digestive problems.[5]

## III.  PROCEDURAL HISTORY

Mammarella filed a medical negligence action, alleging that the Healthcare Providers were negligent in failing to diagnose the lump in her breast as cancer immediately.  Mammarella claims that the six-month delay in her diagnosis caused a change in her treatment options, namely that she had to undergo chemotherapy rather than radiation.  To establish her claim, Mammarella needed to offer sufficient evidence for a jury to find a causal link between the six-month delay in her diagnosis and the fact that she had to undergo chemotherapy.  In other words, Mammarella had to provide sufficient evidence from which a jury could determine that if the Healthcare Providers had diagnosed her cancer six months earlier, then she would not have had to undergo chemotherapy.

Mammarella identified four medical experts who would testify in her case: (i) Dr. David N. Powers, an OB/GYN, (ii) Dr. Lawrence Milner, a radiologist; (iii) Dr. Penman, Mammarella's treating surgeon; and (iv) Dr. Biggs, Mammarella's treating oncologist.[6]  During discovery, Dr. Powers only testified about the standard of care, and not about causation.[7]  Dr. Milner also did not testify about causation.[8]  Dr. Penman testified that Mammarella's prognosis, treatment, and cancer stage were not affected by the alleged delay in diagnosis, and generally deferred to Dr. Biggs.[9]  Thus, Dr. Biggs was the only expert that Mammarella designated to testify about the causation issue.  His testimony was therefore necessary to link the alleged negligence by the Healthcare Providers to Mammarella's alleged injury.

During his discovery deposition, Dr. Biggs testified that he could not say that if a biopsy had been performed on the nodule six months earlier it would have revealed Mammarella's breast cancer, because "[t]hat would be pure speculation."[10]  Dr. Biggs added, "I think it's impossible to go back in time on the basis of an imaging report and say what the pathology was at that time.  And so I can't speculate as to

4.  B–6 (Joint Pretrial Stipulation).

5.  A–89 (Mammarella Dep.), Tr. 81:16–84:17.

6.  Mammarella also identified a fifth expert, Gabriella M. D'Andrea, M.D., but she was later withdrawn and did not testify in the case.

7.  B–28 (Powers Dep.), Tr. 163:7–10 ("[A]re you qualified to provide an opinion as to the change in prognosis for a breast cancer treatment?  A. I am not."); *id.* at 165:15–19 ("In terms of prognosis and treatment for a breast cancer patient of yours, would you defer to an oncologist's opinion regarding both prognosis and treatment?  A. Yes.").

8.  B–31 (Milner Dep.), Tr. 24:11–17 ("Q. What I'm asking is, since you haven't said anything about causation in these disclosures, I assume you're not going to give any opinions with regard to causation, that is, whether or not the delay in getting this biopsy caused any harm to this particular patient?  A. Correct.").

9.  B–34 (Penman Dep.), Tr. 21–23 (agreeing with and deferring to Dr. Biggs); BB100 (Penman Dep.), Tr. 20:1–5 ("Q. So more likely than not the pathology of the tumor and the stage of the patient's cancer had not changed from October 2009 until May 2010; is that— A.  It does not appear to.").

10.  BB027 (Biggs Disc. Dep.), Tr. 18:7–13.

what the pathology would have been six months earlier just based on an ultrasound or mammogram." [11] Dr. Biggs also testified that he could not say whether Mammarella's prognosis had changed,[12] explaining that 8 millimeters was not a "bright line" cut-off measurement for determining whether chemotherapy is required or appropriate.[13] In sum, Dr. Biggs's testimony did not support Mammarella's claim that her treatment or prognosis had changed because of the alleged six-month delay in her diagnosis:

> Q. Okay. And I just want to clarify and make sure that I understand your opinions, but I believe you have no opinion as to any differences in treatment from October 2009 to May 2010 that the patient may have needed; correct?
>
> A. Yes, I have no—I can't state that there's any—I can't state what my opinion would have been at an earlier point in time.

**11.** BB028–29 (Biggs Disc. Dep.), Tr. 19:22–20:2; *see also* BB034–35 (Biggs Disc. Dep.), Tr. 25:24–26:7 ("Is there any way that you could state to a reasonable degree of medical probability that there was any diminished chance of survival or worsening of the prognosis? A. I don't think I can state that one way or the other. I mean, that's—as I said before, trying to predict six months earlier what something would have been is, in my opinion, impossible.").

**12.** BB035–36 (Biggs Disc. Dep.), Tr. 26:21–27:3 ("Doctor, when we left off we were talking about the fact that you were unable to provide an opinion as to whether or not the patient's prognosis changed from October 2009 to May 2010, is that right? A. Yes.... that would be speculation, and relatively uninformed speculation."); BB046 (Biggs Disc. Dep.), Tr. 37:11–14 ("I can't say for any one individual, well, you know, six months later, six months earlier, you know, you would have been thus and so and so your prognosis would have changed.").

**13.** BB042–43 (Biggs Disc. Dep.) ("If it's between 5 and 10 [millimeters], you know, it's a gray zone.").

> Q. And the same would hold true for prognosis; correct?
>
> A. I can't state what the prognosis would have been at an earlier point in time.
>
> Q. And the same thing with level of invasion; correct?
>
> A. There's no way to predict that with any level of certainty.[14]

When discovery was complete, the Healthcare Providers filed a joint motion for summary judgment, arguing that Mammarella had not presented sufficient evidence to establish that their alleged negligence caused Mammarella's alleged injury. That motion was denied, based on representations from Mammarella's counsel that Dr. Biggs's testimony at trial would be sufficient to buttress a jury verdict that Mammarella would have undergone a different treatment plan if not for the delay in her diagnosis.[15]

**14.** BB072 (Biggs Disc. Dep.), Tr. 63:13–64:4.

**15.** A–37 (Ruling on Mot. for Summ. J. Aug. 22, 2013), Tr. 31:23–6 ("Q. Is the plaintiff's expert going to testify within a reasonable degree of medical probability that this woman needed chemotherapy as a result of the delay? And the answer from [Mammarella's counsel] is Dr. Biggs—A. Dr. Biggs. Q.—is going to testify to that."); A148–149 (Hr'g Tr. Sept. 19, 2013), Tr. 37:21–38:20 ("Previously on defendant's motion for summary judgment, I denied the motion because the representations from counsel—[Mammarella]'s counsel—was that Dr. Biggs would be able to establish at trial that the breach in the standard of care was the proximate cause of the injuries to include the change in treatment from a partial breast radiation to chemotherapy.... [Mammarella] indicated that Dr. Biggs would state that [Mammarella would have] undergone a different treatment plan but for the delay in diagnosis. And that was—that's what's stated in the pretrial stipulation and [ ] those are the representations that had previously been made.").

Mammarella confirmed that the change in treatment options from radiation to chemotherapy was the only issue for trial,[16] and that Dr. Biggs was her only expert who would be testifying on the causation issue.[17] Dr. Biggs was unavailable for the trial, so his videotaped trial deposition was taken. During his trial deposition, Dr. Biggs testified that he could not make a treatment recommendation until after the tumor was removed and its pathological stage could be confirmed. Thus, Dr. Biggs could not state with a reasonable degree of medical certainty what Mammarella's diagnosis or treatment would have been six months earlier:

Q. If one were to ask you in your medical opinion what this patient's treatment would have been prior to her definitive diagnosis, could you give an opinion to that effect?

A. No.

Q. Okay. And so if one were to ask you what this patient's treatment would have been or what treatment she would have required in October 2009, you couldn't state that, correct?

A. Correct.

Q. Okay. You would be speculating if you gave that information, correct?

A. Correct.[18]

Dr. Biggs also testified that because the measurements obtained on imaging are considered to be imprecise, he could not be sure exactly what size Mammarella's tumor was six months earlier:

Q. And do you have any opinion as to how big Mrs. Mammarella's tumor would have been in October 2009 based on the imaging studies alone?

A. The—no.

Q. And so you can't tell the jury how big Mrs. Mammarella's tumor was in October 2009, correct?

A. Correct.[19]

Later in his trial deposition, Dr. Biggs was asked to, and did, clarify his testimony:

Q. I just want to make sure that we all understand your testimony today. You can't tell the jury to a reasonable degree of medical probability what Mrs. Mammarella's treatment would have been in October 2009. Is that correct?

A. Correct.[20]

After Dr. Biggs's deposition and before the trial began, the Healthcare Providers filed a motion for judgment as a matter of law. Because Dr. Biggs was Mammarella's only expert on causation, the Superior Court was able to consider all of the medical expert testimony that would be submitted to the jury on that issue. After a hearing on September 19, 2013, the Superior Court granted the motion. The Superior Court quoted from Dr. Biggs's trial deposition at length, and found that "[t]his testimony doesn't appear to comport with what was anticipated."[21] The Superior Court determined that:

[Mammarella]'s only evidence on causation by Dr. Biggs is speculative and I think Mammarella fails to make a prima facie case on the issue of causation.

16. B–6 (Joint Pretrial Stipulation); A–37 (Ruling on Mot. for Summ. J. Aug. 22, 2013), Tr. 29:22–30:16; A112 (Hr'g Tr. Sept. 19, 2013), Tr. 5:19–23, 7:12–18, 27:6–8, 36:19–37:20, 38:18–39:4.

17. A–37 (Ruling on Mot. for Summ. J. Aug. 22, 2013), Tr. 31–32; A112 (Hr'g Tr. Sept. 19, 2013), Tr. 6:5–11, 25:5–11.

18. B–44 (Biggs Trial Dep.), Tr. 35:6–19.

19. B–44 (Biggs Trial Dep.), Tr. 36:10–18.

20. B–46 (Biggs Trial Dep.), Tr. 41:6–12.

21. A–150 (Hr'g Tr. Sept. 19, 2013), Tr. 39:6–7.

[Biggs] is unable to state with a reasonable degree of medical probability whether ... [the Healthcare Providers]'s failure to diagnose[ ] in October had caused her a different treatment option. [Mammarella] fails to prove causation [which] is an element of her case on which she does carry the burden of proof and given that no other expert is going to testify as to causation, I'm going to grant [the Healthcare Providers]'s motion as a matter of law.[22]

In other words, the Superior Court concluded that Dr. Biggs's testimony, even if accepted as true by the jury, would not provide a sufficient basis to establish the required causal nexus between the alleged medical negligence and the change in Mammarella's treatment.

## IV. ANALYSIS

■ We review a trial court's decision to grant judgment as a matter of law *de novo*.[23] Judgment as a matter of law may be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue."[24] This Court "must determine whether the evidence and all reasonable inferences that can be drawn therefrom, taken in the light most favorable to the nonmoving party, raise an issue of material fact for consideration by the jury.'"[25]

■ The Healthcare Medical Negligence Insurance and Litigation Statute, codified at 18 *Del. C.* § 6853, provides that: "No liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case *and as to the causation of the alleged personal injury* or death."[26] Thus, Mammarella must present expert testimony at trial that establishes causation. This Court has explained that "when an expert offers a medical opinion it should be stated in terms of 'a reasonable medical probability' or 'a reasonable medical certainty'"[27] and "[a] doctor cannot base his expert medical opinion on speculation or conjecture."[28] As a result, "[a] doctor's opinion about what is possible is no more valid than the jury's own speculation as to what is or is not possible."[29]

In this case, Dr. Biggs was Mammarella's only expert who was scheduled to testify about the causation issue. Dr. Biggs participated in a videotaped deposition because he would not be available for trial. Once that deposition was completed, all the evidence about causation that Mammarella was relying on was available to the Superior Court, which could therefore determine as a matter of law whether Mammarella had established a legally sufficient evidentiary basis for a reasonable jury to find that Mammarella's injury was caused by the alleged negligence of the Health-

**22.** A–161 (Hr'g Tr. Sept. 19, 2013), Tr. 50:23–51:10.

**23.** *Kardos v. Harrison,* 980 A.2d 1014, 1016 (Del.2009) (citing *Brown v. Liberty Mut. Ins. Co.,* 774 A.2d 232, 245 (Del.2001)).

**24.** Super. Ct. Civ. R. 50(a)(1).

**25.** *Kardos v. Harrison,* 980 A.2d 1014, 1016 (Del.2009) (citing *Russell v. Kanaga,* 571 A.2d 724, 731 (Del.1990)).

**26.** 18 *Del. C.* § 6853(e)(3) (emphasis added).

**27.** *O'Riley v. Rogers,* 69 A.3d 1007, 1011 (Del. 2013) (citing *Floray v. State,* 720 A.2d 1132, 1136 (Del.1998)).

**28.** *Id.*

**29.** *Id.* (citing *Oxendine v. State,* 528 A.2d 870, 873 (Del.1987)) (internal quotations omitted).

care Providers.[30]

The Superior Court properly found that Dr. Biggs's testimony did not provide a sufficient evidentiary basis, as required by § 6853(e)(3), for the jury to find that Mammarella's treatment options changed as a result of the alleged medical negligence. To the contrary, Dr. Biggs testified that he could not opine on Mammarella's diagnosis or treatment to a reasonable degree of medical probability, and that any opinion about those issues would be speculative. Mammarella argued "that there is an element of understandable bias when the doctor is testifying about a patient referred to him by the [Healthcare Providers], a group he works with on a daily basis."[31] But Mammarella was free to choose her expert witness, and she chose Dr. Biggs, who did not provide testimony that was legally sufficient to support her claims. In other words, Mammarella either chose not to find an expert other than Dr. Biggs to provide testimony that would meet her evidentiary burden, or Mammarella tried to obtain such an expert opinion and could not find an expert who would give it. Whichever may be the case, the reality is that the Superior Court properly found that Mammarella had failed to provide sufficient evidence of causation to support a verdict in her favor.

At oral argument, Mammarella's counsel presented—for the first time—a recast version of certain language from Dr. Biggs's testimony. Dr. Biggs said, "I think looking back at our initial consulta-tion note, I indicated that if the tumor was no larger than it appeared on ultrasound, which I think was, what, 8 millimeters, that I would likely feel that she would not take chemotherapy."[32] Relying on *Hugg v. Torres*,[33] Mammarella suggests that the word "likely" could be replaced with the word "probably," so that Dr. Biggs's testimony would read, "I think looking back at our initial consultation note, I indicated that if the tumor was no larger than it appeared on ultrasound, which I think was, what, 8 millimeters, that I would [probably] feel that she would not take chemotherapy." Mammarella suggests that this testimony, as recast by her counsel, established causation to a reasonable degree of medical probability.

■ Because this argument was not raised below or in the briefs, it is waived.[34] But even if we were to consider it, the result would be the same. Dr. Biggs's next sentence was, "I would like to underline the word likely, though, *because it's really a gray zone.*"[35] Dr. Biggs then went on to say:

> [W]hen you are in that gray zone, you really have to have a patient who … you have to suss out … you have to try to understand the desires of the patient to be aggressive and try to help them understand the risks and potential benefits within the level of uncertainty that we have. So it's not quite as exact as that.[36]

Fairly read, Dr. Biggs's testimony is clear that he could not and did not say, to a

30. *Kardos v. Harrison,* 980 A.2d 1014, 1017 (Del.2009).

31. Reply Br. at 2.

32. B–43 (Biggs Trial Dep.), Tr. 30:9–14.

33. 1993 WL 189492 (Del.Super. May 21, 1993), *rev'd on other grounds,* 637 A.2d 827 (Del.1993).

34. *See* Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review…."); Supr. Ct. R. 14(b)(vi)(3) ("The merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal.").

35. B–43 (Biggs Trial Dep.), Tr. 30:14–16.

36. B–43 (Biggs Trial Dep.), Tr. 30:17–24.

reasonable degree of medical probability, that he would have recommended radiation instead of chemotherapy in October 2009, even if the tumor had been smaller than 8 millimeters in size when it was removed. Rather, at most Dr. Biggs's testimony can be read as saying that a tumor size of 8 millimeters or less is one factor that may permit a patient to be treated without chemotherapy, but that there is no binary tumor size beneath which chemotherapy is not prescribed, and that other factors bear importantly on the method of treatment. Dr. Biggs's testimony is also clear that he could not and did not say, to a reasonable degree of medical probability, that his treatment recommendations would have changed solely because of the growth in the size of the tumor during the six-month delay in her diagnosis.[37] Thus, Dr. Biggs's testimony was not sufficient to establish the causation element of Mammarella's claim.

■■■ Mammarella also argued that, even if Dr. Biggs's testimony was not enough, her affidavit of merit was legally sufficient to establish a prima facie case. 18 *Del. C.* § 6853(a) requires all medical negligence lawsuits to be accompanied by an affidavit of merit from an expert witness "stating that there are reasonable grounds to believe that there has been healthcare medical negligence committed by each defendant." Mammarella claims that the affidavit of merit alone is enough to meet her burden of establishing causation. But Mammarella's argument turns the statutory purpose of the affidavit of merit upside down. The General Assembly intended the affidavit of merit merely to operate "as a prophylactic measure" to "reduce the filing of meritless medical negligence claims."[38] As a result, the requirements for the affidavit of merit "are purposefully minimal."[39] Although the affidavit of merit may establish a prima facie case sufficient to get through the courthouse doors, it is not enough to meet a plaintiff's legal burden to submit trial evidence sufficient to support a jury verdict in her favor. In fact, by its plain terms, 18 *Del. C.* § 6853(d) limits the use of an affidavit of merit, barring the defense from even discovering the plaintiff's affidavit of merit and precluding the use of the affidavit of merit as evidence or as impeachment material.[40]

Of course, the expert witness who provides an affidavit of merit might be capable of testifying to facts that establish more than a prima facie case. If those facts were sufficient to support a jury verdict, then the plaintiff would be entitled to have the jury decide the case. But that would be because the expert witness was qualified to testify as to the required elements necessary to support a jury verdict. In that case, the person filing the affidavit should be identified as a trial witness and be made available for deposition by the other side. Here, the person signing the affidavit of merit was Dr. Powers, Mammarella's OB/GYN. Dr. Powers does not give treatment recommendations to cancer patients, does not administer chemotherapy, and is not qualified to issue an opinion about whether the six-month delay in her

37. B–44 (Biggs Trial Dep.), Tr. 35:6–36:18

38. *Dishmon v. Fucci*, 32 A.3d 338, 342 (Del. 2011).

39. *Id.*

40. 18 *Del. C.* § 6853(d) provides that "... The affidavit of merit shall not be discoverable in any medical negligence action. The affidavit of merit itself, and the fact that an expert has signed the affidavit of merit, shall not be admissible nor may the expert be questioned in any respect about the existence of said affidavit in the underlying medical negligence action or any subsequent unrelated medical negligence action in which that expert is a witness."

diagnosis caused Mammarella to have to undergo chemotherapy. Dr. Powers did not testify about causation during his discovery deposition and was not scheduled to testify about causation at trial. Rather, Mammarella repeatedly confirmed that Dr. Biggs was her sole expert who would testify .about causation. Dr. Powers stated that he had no reason to disagree with Dr. Biggs and would defer to an oncologist's opinion regarding both prognosis and treatment.[41]

■ Mammarella claimed that Dr. Powers could testify that the tumor had grown during the six-month delay, and argued that "[o]n the simplest facts present here, namely an increase in size of a malignant tumor causing physical and emotional harm, the case is no longer eligible for decision as a matter of law."[42] We recognize and empathize with the understandable doubts Mammarella harbored because of the delay in her diagnosis, and how those doubts made a horrible experience even more difficult. But our law requires a medical opinion from an expert witness to be based on a reasonable degree of medical probability. Although Dr. Powers might have been able to testify that the tumor had grown, Mammarella had no expert testimony to support her argument that her treatment changed because of that growth. Thus, the Superior Court properly granted judgment as a matter of law.

## V. CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is hereby AFFIRMED.

---

41. BB094 (Powers Dep.), Tr. 171:19–22, 173:19–174:5.

