# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHARLES TROTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N20C-09-182 SPL |
| | ) | |
| BAYHEALTH MEDICAL CENTER, | ) | |
| INC., KENT GENERAL HOSPITAL, INC., | ) | |
| BAYHEALTH NEUROSURGERY, JAMES | ) | |
| MILLS, MD, NASAROLLAH FATEHI, MD, | ) | |
| JOHN CHUKWUDIFU, PA-C, | ) | |
| JULIA MATT, RN, TYLER BOHANON, | ) | |
| RN,[1] and WHITNEY CESSNA, RN, | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: November 27, 2023
Decided: February 16, 2024

## MEMORANDUM OPINION AND ORDER

*Upon Defendants Julia Matt and Tyler Bohanon's*
*Motion for Summary Judgment,* **GRANTED.**

*Upon Defendant Whitney Cessna's*
*Motion for Summary Judgment,* **GRANTED.**

*Upon Defendant Bayhealth Medical Center Inc.'s*
*Motion for Partial Summary Judgment,* **GRANTED.**

---

[1] Tyler Bohanon's surname is spelled variously throughout the pleadings as Bohanon, Bohanan, and Bohannon. The Court will use the spelling provided in the complaint – Bohanon. To the extent that this is an incorrect spelling, the Court intends no disrespect.

Michael Mongeluzzi, Esquire (Argued), Joseph DeAngelo, Esquire, of BARRETT DEANGELO, LLC, West Chester, Pennsylvania; Linda Malkin, Esquire, of KIMMEL CARTER ROMAN PELTZ & O'NEIL, P.A., Wilmington, Delaware, *Attorneys for Plaintiff, Charles Trott.*

Joseph Drnec, Esquire (Argued), Phillip Casale, Esquire, of WHARTON LEVIN EHRMANTRAUT & KLEIN, P.A., Wilmington, Delaware; *Attorneys for Defendants Bayhealth Medical Center, Inc., Julia Matt, RN and Tyler Bohanon, RN.*

Bradley Goewert (Argued), Esquire, Thomas Marcoz, Jr., Esquire, of MARSHALL DENNEHEY, P.C., Wilmington, Delaware, *Attorneys for Defendant Whitney Cessna, RN.*

**LUGG, J.**

## I. INTRODUCTION

Plaintiff, Charles Trott ("Trott"), sued Bayhealth Medical Center, Inc. ("Bayhealth"), Kent General Hospital, Inc.,[2] Bayhealth Neurosurgery, James Mills, M.D. ("Dr. Mills"), Nasrollah Fatehi, M.D. ("Dr. Fatehi"), John Chukwudifu, PA-C ("PA Chukwudifu"), Whitney Cessna, RN ("Nurse Cessna"), Julia Matt, RN ("Nurse Matt"), and Tyler Bohanon, RN ("Nurse Bohanon"), for medical negligence related to the December 2018 treatment of injuries to his spinal cord resulting in his quadriplegia.[3] Nurses Cessna, Matt, and Bohanon have moved for summary judgment,[4] and Bayhealth seeks partial summary judgment to the extent it is alleged to be responsible for the negligence of Nurses Cessna, Matt, and Bohanon.[5] Trott opposes these motions.[6]

In his complaint, Trott alleges that Nurses Cessna, Matt, and Bohanon were negligent and careless for:

> a. Failing to provide and afford proper and careful medical and nursing care and treatment to [Mr. Trott] during his December 9, 2018, admission;

---

[2] In its answer to the complaint, Bayhealth asserted "Kent General, Inc." and "Bayhealth Neurosurgery" are not properly named legal entities. D.I. 14 ("Bayhealth Ans.) at n.1.

[3] *See generally* Pl.'s Compl. (D.I. 1) ("Compl.").

[4] D.I. 111 ("Cessna Mot."); D.I. 110 ("Matt & Bohanon Mot.").

[5] D.I. 113 ("Bayhealth Mot.").

[6] D.I. 116 ("Ans. Matt & Bohanon"); D.I. 117 ("Ans. Cessna"); D.I. 118 ("Ans. Bayhealth").

b. Providing medical and nursing care and treatment to [Mr. Trott] which was below the standard of care in the community, increasing the risk of harm to Mr. Trott's well-being;

c. Failing to properly evaluate Mr. Trott during his December 9, 2018, presentation to Kent General Hospital;

d. Failing to properly communicate Mr. Trott's condition amongst his healthcare providers on December 9, 2018;

e. Failing to perform proper neurological assessments on December 9, 2018;

f. Failing to perform proper neurological checks on December 9, 2018; and

g. Permitting Mr. Trott's spinal cord injury to progress to quadriplegia on December 9, 2018.[7]

Trott contends that the nurses' carelessness and negligence caused his:

serious, disabling and permanent personal injuries, including, but not limited to: the development and progression of a spinal cord injury; spinal cord contusion; spinal cord edema; permanent paralysis of the upper extremities; permanent paralysis of the lower extremities; quadriplegia; neurogenic bladder, tracheostomy, PEG tube placement and feedings; respiratory distress; acute ventilator dependent respiratory failure; pneumonia; fracture of the ribs; the need to undergo extensive medical and surgical care; the need to undergo extensive therapy and rehabilitation; he has suffered extreme anxiety, pain and suffering, loss of life's pleasures, and other emotional distress due to the devastating physical and emotional sequelae associated with the spinal cord injury; he has been caused to require significant amounts of medications; he has suffered other medical and psychological injuries, the full extent of which have yet to be determined; he has been forced to undergo extensive hospitalization and physical/occupational therapy; he suffered other orthopedic, spinal, neurological, psychological and psychiatric injuries, the full extent of which have yet to be determined; he has in the past and may in the future continue to require medicines, medical aid, medical care, treatment and rehabilitation; he has incurred significant medical expenses, he has in the past and will in the future continue to suffer agonizing aches, pains, suffering and mental anguish; he has in the past and will in the future continue to be permanently

---

[7] Compl. ¶ 115.

4

disabled from performing his usual duties, occupations and avocations, all to his great loss and detriment; he has sustained a loss of earnings and a loss of future earning capacity; he has endured and continues to endure pain and suffering; and he has in the past and will in the future continue to suffer loss of life's pleasures as a result of his injuries.[8]

Trott offered Edward N. Shradar, RN, MSN, CEN, ("Nurse Shradar") as an expert on nursing standards of care,[9] and Dr. James Holsapple ("Dr. Holsapple") as a medical expert to opine on causation.[10] The parties deposed both experts and, following his deposition,[11] Dr. Holsapple offered a supplemental letter to clarify his deposition testimony.[12]

With the medical expert testimony fully developed, Nurses Cessna, Matt, and Bohanon moved for summary judgment.[13] They argue that Trott has failed to offer expert testimony establishing a causal link between their alleged negligence and his injuries.[14] Trott opposes the motions and posits that the opinions offered by Nurse Shradar (on negligence) and Dr. Holsapple (on causation) establish that the nurses

---

[8] *Id.* ¶ 116.

[9] Ans. Cessna, Ex. B ("Shradar Rpt.").

[10] Ans. Matt & Bohanon, Ex. B (D.I. 116) ("Holsapple Rpt."); Ans. Cessna, Ex. C ("Holsapple Rpt.").

[11] Ans. Matt & Bohanon, Ex. F ("Holsapple Dep."),

[12] Ans. Matt & Bohanon, Ex. C ("Holsapple Supp. Rpt."); Ans. Cessna, Ex. D ("Holsapple Supp. Rpt.").

[13] Matt & Bohanon's Mot.; Cessna Mot.

[14] Matt & Bohanon Mot. ¶ 16; Cessna Mot. ¶ 10.

breached the applicable standard of care thereby "causing the tragic outcome of Mr. Trott's condition."[15]

## II. FACTUAL AND PROCEDURAL BACKGROUND

On December 2, 2018, Trott sustained a spinal cord injury in a motor vehicle accident and was transported to Kent General Hospital by ambulance for treatment.[16] On December 4, 2018, Dr. Mills surgically placed an odontoid screw to address Trott's spinal cord injury.[17] A physician's assistant cleared Trott for discharge on December 5, 2018, and directed Trott to follow-up with medical staff in two weeks.[18]

A few days after his discharge home, Trott "experienced increased pain in his neck and sudden numbness in his extremities; he called 911 and emergency medical services ("EMS") arrived" and documented his condition.[19] EMS personnel transported Trott to Kent General Hospital by ambulance on December 9, 2018.[20] Upon Trott's arrival at approximately 1:20 a.m., an Emergency Department

---

[15] Ans. Matt & Bohanon at 6; Ans. Cessna at 5-6.

[16] Compl. ¶ 60.

[17] *Id.* ¶¶ 65-66.

[18] *Id.* ¶¶ 69-70.

[19] *Id.* ¶ 72.

[20] *Id.* ¶ 72.

physician noted that he was "suffering from sudden and severe neck pain with moderate weakness."[21]

Around 1:30 a.m., the Emergency Department's triage nurse noted Trott's numbness in all extremities.[22]  At 2:00 a.m., Nurse Cessna assumed care of Trott in the Emergency Department, where Trott's neck and back pain escalated to a level of 9 out of 10.[23]  A 2:06 a.m. CT scan revealed that the odontoid screw had shifted.[24]

Around 2:30 a.m., Defendant John Chukwudifu, PA-C ("PA Chukwudifu"), conducted a neurosurgical evaluation of Trott in the Emergency Department.[25]  He diagnosed Trott with a spinal cord injury and documented his impression that the odontoid screw had shifted.[26]  PA Chukwudifu admitted Trott to the Neurological Intensive Care Unit ("Neuro ICU") and ordered hourly neurological evaluations and an MRI.[27]  At 4:58 a.m., Nurse Cessna noted an increase in Trott's neck pain to a

---

[21] *Id.* ¶ 73.

[22] *Id.* ¶ 74.

[23] *Id.* ¶¶ 74-75.

[24] *Id.* ¶ 76.

[25] *Id.* ¶ 77.

[26] *Id.*

[27] *Id.*

level of 10 out of 10.[28]  No records indicate whether Nurse Cessna "communicated Mr. Trott's condition to an appropriate healthcare provider."[29]

At 6:45 a.m., Trott moved from the Emergency Department to the Neuro Intensive Care Unit where Nurse Matt assumed his care.[30]  At 7:00 a.m., Nurse Matt performed a neurological evaluation on Trott, recording that he was awake, alert, and oriented, but only had "flicker of muscle" movement in his extremities.[31]  The records do not indicate Nurse Matt informed anyone of Trott's condition.[32]

At 8:00 a.m., Nurse Bohanon performed a neurological evaluation of Trott and noted "weakness" in his extremities.[33]  The records do not indicate Nurse Bohanon alerted any other healthcare provider of Trott's condition.[34]  At 8:55 a.m., PA Chukwudifu evaluated Trott, observed "no antigravity movement in any of his extremities," and notified Dr. Mills of Trott's "neurologic deterioration."[35]

---

[28] *Id.* ¶¶ 78-79.

[29] *Id.* ¶ 79.

[30] *Id.* ¶¶ 80-81.

[31] *Id.* ¶ 81.

[32] *Id.* ¶ 82.

[33] *Id.* ¶ 83.

[34] *Id.* ¶ 84.

[35] *Id.* ¶ 85.

8

Nurse Bohanon evaluated Trott at about 9:32 a.m. and noted that "during the 0900 neuro check, [Trott] tolerated HOB elevation of approximately 2 – 3 inches."[36] Around 10:00 a.m., Nurse Bohanon performed another neurological evaluation and noted that Trott "[w]as awake, alert, and oriented" and "suffering from diminished motor and sensory functions" with "flicker of muscle movement" in his extremities.[37] The records do not indicate Nurse Bohanon informed any other healthcare provider of Trott's condition.[38] But, at Dr. Fatehi's direction, Nurse Bohanon "entered a verbal order for hourly neuro checks."[39] Around 11:00 a.m., Nurse Bohanon evaluated Trott and reported a total loss of movement in his extremities.[40]

Following Nurse Bohanon's 11:00 evaluation, based on the allegations in Trott's complaint, it appears that Nurses Cessna, Matt, and Bohanon were relieved of Trott's care. "The records indicate that, at or about 1:00 [p.m., Trott] suffered further respiratory distress and required endotracheal intubation and mechanical ventilation."[41] Trott remained under evaluation at Kent General Hospital until

---

[36] *Id.* ¶ 86.

[37] *Id.* ¶ 88.

[38] *Id.* ¶ 89.

[39] *Id.* ¶ 90.

[40] *Id.* ¶ 91.

[41] *Id.* ¶ 93.

January 2, 2019 when he was discharged to Magee Rehabilitation Hospital in Philadelphia, Pennsylvania.[42]  The following day, Magee Rehabilitation Hospital transferred Trott to Thomas Jefferson University Hospital ("Jefferson Hospital"), where he underwent emergency surgery on January 8, 2019.[43]  Jefferson Hospital discharged Trott to a rehabilitation hospital on January 9, 2019.[44]

Trott offered Nurse Shradar to establish the standard of care required of Nurses Cessna, Matt, and Bohanon.  After reviewing available material, Nurse Shradar concluded that each nurse deviated from the standard of care required under the circumstances.[45]  Nurse Shradar concluded that Nurse Cessna failed to follow a documented order directing regular neurological checks, failed to document Trott's neurological decline, and failed to notify appropriate healthcare providers of Trott's decline.[46]  Further, Nurse Shradar opined that Nurses Matt and Bohanon failed to notify appropriate healthcare providers of changes in Trott's condition.[47]

Trott offered Dr. Holsapple to establish the causal connection between all defendants' (nurses, physician's assistants, and doctors) negligence and Trott's

---

[42] *Id.* ¶ 101.

[43] *Id.* ¶¶ 102. 107.

[44] *Id.*

[45] Shradar Rpt. at 6.

[46] *Id.* at 5.

[47] *Id.* at 5-6.

injury. After reviewing the medical records and depositions of the defendant healthcare providers, Dr. Holsapple opined:

1) The standard of care requires that appropriate imaging be obtained to determine the cause of progressive neurological signs and symptoms suggesting spinal cord compression.

2) More likely than not, Mr. Trott's neurological condition declined significantly between 3:25 AM and 7 AM on 12/9/18.

3) More likely than not, Mr. Trott's neurological condition declined significantly between 3:25 AM and 7 AM on 12/9/18 as a result of spinal cord compression and spinal cord injury.

4) The standard of care requires that new and significant neurological deficits observed by hospital nursing staff be reported promptly to the primary team physicians and/or their designated assistant providers.

5) Upon learning of a progression of his neurological symptoms the standard of care required appropriate imaging be obtained to rule out clinically significant cord compression and/or instability.

6) The standard of care requires that upon learning of new and significant neurological deficits the primary team physicians and/or their designated assistant providers perform a prompt beside evaluation.

7) In the setting of suspected acute and/or worsening symptomatic spinal cord compression, the standard of care requires that appropriate and timely spinal imaging be obtained and reviewed.

8) More likely than not had spinal imaging been obtained in the morning (AM) on 12/9/19, significant spinal cord compression and evidence of spinal cord injury would have been demonstrated.

9) In the setting of spinal instability, progressive symptomatic acute spinal cord compression and incomplete spinal cord injury, timely spinal decompression and possible definitive stabilization are indicated.

10) Acute and progressively symptomatic spinal cord compression due to spinal column instability is treatable. Timely decompression and stabilization can be associated with an increased probability of functional recovery. Delay may be associated with poorer outcomes and permanent neurological deficits.

11) More likely than not had Mr. Trott undergone appropriate and prompt bedside evaluation and spinal imaging in the AM of 12/9/19, progressive and treatable spinal cord compression would have been identified and decompression-stabilization surgery recommended to increase the chance of meaningful neurological recovery.[48]

In his August 1, 2023, deposition, Dr. Holsapple testified that it was unclear what, if anything, the nurses did after noticing Trott's decline around 7:00 a.m.[49] But Dr. Holsapple could not say "more likely than not an earlier notification from nursing staff would have impacted the outcome in this case."[50] He continued:

I don't think I could say at the level of more likely than not, that confusion or some potential delay in communication from the nurses to whoever and most importantly Dr. Mills is linkable at the level of more likely than not – so with certainty – to a difference in outcome. It certainly isn't a good thing if it's true that the nurses didn't let people know that this guy, that Mr. Trott was now essentially quadriplegic.

I mean, if that's true, that's a deviation, no question about it. You don't not report that kind of information immediately, right? So if they didn't – and again, that's an "if" there, there are variable accounts on this, right – but if that's true, that's a deviation. Is that a deviation in a very clear-cut and direct more-likely-than-not way associated with the worst outcome? I don't think I can say that.[51]

---

[48] Holsapple Rpt. at 6-8.

[49] Holsapple Dep. at 118-121.

[50] *Id.* at 128.

[51] *Id.* at 128-29.

12

So, I mean, I may express that in some way, but I wouldn't express it as I think the nurses or some other providers deviated from the standard of care, and more likely than not because of the deviation, you know, things turned out, you know, worse. I won't say those things. I might allude to what I am saying right now, which is sort of like that. I mean, it's a little uncomfortable, right, that this kind of went on for so long. But I couldn't say that, and I don't think that I will say such a thing.[52]

When specifically asked about Nurse Cessna, Dr. Holsapple explained, "I don't see any evidence that that nurse, Ms. Cessna, deviated from the standard of care and that that deviation is linked to some sort of aspect of the bad outcome."[53]

Perceiving some confusion over his deposition testimony, Dr. Holsapple provided clarification to Trott's counsel by letter.[54] Dr. Holsapple explained, as he did during his deposition, that "there does not appear to be any communication of the progression of neurological symptoms and deficits by nursing [between 3:25

---

[52] *Id.* at 132-33.

[53] *Id.* at 133-34.

[54] Holsapple Supp. Rpt. The Court understands that defendants object to its consideration of Dr. Holsapple's Supplemental Correspondence as having been provided after an established discovery deadline. The Court considers this document, together with Dr. Holsapple's report and deposition, in the light most favorable to Trott as the non-moving party. The Court declines to reject this document on procedural or other grounds. *But see, e.g., Estate of Stone v. Bayhealth Medical Center, Inc.,* 2023 WL 7018404 (Del. Super. Ct. Oct. 24, 2023) (declining to consider post-deposition affidavit of medical witness under the sham affidavit doctrine).

13

a.m. and 7:00 a.m.]."[55]  In his view, the applicable nursing standard of care required

notification to other medical professionals, but he could not:

> say whether or not the neurological team would have so acted in accordance with the standard of care if provided with this information sooner given that the standard of care was violated in this case, including following the discovery of the progressive compromise by the physician's assistant at about 8:45 to 9:00 a.m.[56]

He concludes his correspondence by noting that all his opinions "have been stated

to a reasonable degree of medical probability."[57]

### III.  STANDARD OF REVIEW

Under Superior Court Civil Rule 56, summary judgment will be granted

where "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."[58]

"A material issue of fact exists if 'a rational finder of fact could find some material

fact would favor the moving party in a determinative way.'"[59]  On a motion for

summary judgment, this Court "(i) construes the record in the light most favorable

---

[55] Holsapple Supp. Rpt.

[56] *Id.*

[57] *Id.*

[58] Super. Ct. Civ. R. 56(c).

[59] *Estate of Moulder v. Park*, 2022 WL 4544837, at *3 (Del. Super. Ct. Sept. 28, 2022) (quoting *Deloitte LLP v. Flannagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009)).

14

to the non-moving party; (ii) detects, but does not decide, genuine issues of material fact; and (iii) denies the motion if a material fact is in dispute."[60]

"The moving party bears the initial burden to demonstrate that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[61] "Once the movant meets its burden, then the burden shifts to the non-movant to demonstrate sufficiently an existence of one or more genuine issues of material fact."[62] Summary judgment will not be granted if there is a material fact in dispute or if it "seems desirable to inquire thoroughly into [the facts] in order to clarify the application of the law to the circumstances."[63]

While the Court will consider all facts and reasonable inferences in a light most favorable to the non-moving party,[64] it must not "indulge in speculation and conjecture; a motion for summary judgment is decided on the record presented and not on evidence potentially possible."[65] Summary judgment is also appropriate

---

[60] *US Dominion, Inc. v. Fox News Network, LLC,* 2023 WL 2730567, at *17 (Del. Super. Ct. Mar. 31, 2023) (quoting *CVR Refin., LP v. XL Specialty Ins. Co.*, 2021 WL 5492671, at *8 (Del. Super. Ct. Nov. 23, 2021) (cleaned up)).

[61] *Estate of Moulder*, 2022 WL 4544837, at *4 (citing *Rice v. Rice*, 2020 WL 4908096, at *1 (Del. Super. Ct. 2020)).

[62] *Quality Elec. Co., Inc. v. E. States Const. Serv., Inc.*, 663 A.2d 488 (Del. 1995); *see also* Super. Ct. Civ. R. 56(e); *Moore v. Sizemore*, 405 A.2d 679, 681 (Del. 1979).

[63] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962).

[64] *Nutt v. A.C. & S. Co.*, 517 A.2d 690, 692 (Del. Super. Ct. 1986).

[65] *In re. Asbestos Litig.*, 509 A.2d 1116, 1118 (Del. Super. 1986), *aff'd sub. nom. Nicolet, Inc. v. Nutt*, 525 A.2d (Del. 1987).

where a non-moving party that bears the burden of proof at trial fails to establish the existence of an element essential to that party's case.[66]  In a medical malpractice action, "a defendant is entitled to summary judgment if, after adequate time for discovery, the record unambiguously demonstrates that the plaintiff's allegations are not and will not be supported by expert medical testimony."[67]

## IV.  ANALYSIS

To sustain a claim of healthcare medical negligence, "a plaintiff must present expert medical testimony as to: 1) the applicable standard of care; 2) the alleged deviation from that standard; and 3) the causal link between the breach of the standard of care and the alleged injury."[68]  Under Delaware's Healthcare Medical Negligence Insurance and Litigation statute, "[n]o liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death."[69]  From this it flows that expert medical testimony is required to support proximate causation.[70]

---

[66] *Vick v. Khan*, 2019 WL 2177114 (Del. Super. Ct. May 17, 2019).

[67] *Froio v. Du Pont Hosp. for Children*, 816 A.2d 784, 786 (Del. 2003) (cleaned up).

[68] *Signey v. Pfaff*, 2023 WL 6449153, at *1 (Del. Super. Ct. Oct. 2, 2023) (cleaned up).

[69] 18 *Del. C.* § 6853(e).

[70] *Signey*, 2023 WL 6449153, at *1 (cleaned up).

"Proximate cause is a necessary element of any tort claim."[71] "[A] proximate cause is one which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred."[72] A plaintiff must present expert medical testimony as to both (i) the alleged deviation from the applicable standard of care, and (ii) the causal connection between the wrongful conduct and the alleged injury.[73] "Without the expert testimony, a jury is not permitted to connect the dots between a bare allegation of medical negligence and an injury."[74]

Delaware law mandates that such medical opinions "be based on a reasonable degree of medical probability."[75] Therefore, it is "strongly encouraged" that expert medical opinions "be stated in terms of a reasonable medical probability or a reasonable medical certainty."[76] The trial court retains discretion to determine whether an expert's opinion, even if not articulated in the language of "reasonable medical probability" or "reasonable medical certainty," satisfies the legal standard

---

[71] *Doe v. Wildey,* 2012 WL 1408879, at *4 (Del. Super. Ct. Mar. 29, 2012).

[72] *Id.*

[73] *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991); 18 *Del C.* § 6853(e).

[74] *Signey*, 2023 WL 6449153, at *1 (cleaned up).

[75] *Mammarella v. Evantash*, 93 A.3d 629, 638 (Del. 2014).

[76] *Moses v. Drake*, 109 A.3d 562, 568 (Del. 2015) (internal quotations omitted).

when viewed in the context of all evidence.[77]  However, expert medical opinion may not be premised on speculation and conjecture.[78]  An expert medical opinion regarding "what is possible is no more valid than the jury's own speculation as to what is or is not possible."[79]  Therefore, an expert witness's testimony "concerning 'possible medical consequences, rather than … reasonable medical probability' [is] impermissible speculation."[80]  Opinions that a medical outcome was "feasible,"[81] or even "likely" are not offered with a reasonable degree of medical probability.[82]  The absence of an expert opinion stated with reasonable medical probability as to negligence or causation warrants summary judgment.[83]  Such is the case here.

### A. Expert Medical Testimony Establishes The Nurses Deviated From The Applicable Standard Of Care.

Nurse Shradar opined, within a "reasonable degree of professional certainty," that "there were deviations from the standard of care by the nursing staff in the ED

---

[77] *Id.*

[78] *Id.* (quoting *O'Riley v. Rogers*, 69 A.3d 1007, 1011 (Del. 2013)).

[79] *Mammarella,* 93 A.3d at 635 (quoting *Oxendine v. State*, 528 A.2d 870, 873 (Del.1987)).

[80] *O'Riley*, 69 A.3d at 1011 (quoting *Riegel v. Aastad*, 272 A.2d 715, 718 (Del. 1970)).

[81] *See, e.g., Moses*, 109 A.3d at 568.

[82] *Mammarella*, 93 A.3d at 636-37.

[83] *Russell v. Kanaga*, 571 A.2d 724, 734 (Del. 1990) ("[A]s a matter of law, the Delaware Medical Malpractice statute requires direct expert medical testimony to support a jury's finding of negligence and causation.").

and Neuro ICU on December 9th, 2018."[84] Dr. Holsapple, for his part, concluded that he did not "see any evidence that nurse, Ms. Cessna, deviated from the standard of care."[85] For purposes of this motion, the nurses do not vigorously contest Nurse Shradar's opinion on their failure to adhere to the applicable standard of care, and Dr. Holsapple's contrary conclusion as to Nurse Cessna merely creates an issue of fact. The Court finds that Trott has satisfied the first prong of 18 *Del. C.* § 6853(e); he has offered expert medical testimony supporting the nurses' deviation from of the applicable standard of care in the circumstances of this case.

### B. *Expert Medical Testimony Does Not Establish The Nurses' Breaches Of The Standard Of Care Proximately Caused Trott's Injury.*

This case turns on whether expert testimony supports a causal connection between the nurses' negligence and Trott's injuries. In other words, did the nurses' failure to communicate with medical professionals during the early morning hours of December 9, 2018, proximately cause Trott's paraplegia. Nurses Matt and Bohanon contend that "[t]here is no expert medical opinion stating that any alleged failure timely to communicate the patient's status to the Neurosurgical Providers proximately caused injury."[86] Nurse Cessna joins the motion of Nurses Matt and

---

[84] Shradar Rpt. at 6.

[85] Holsapple Dep. at 133-34.

[86] Matt & Bohanon Mot. at 6, ¶ 15; *id.* at 3, ¶ 10 ("Dr. Holsapple was unable to state, to a reasonable degree of medical probability, that the [Nurses'] alleged failure to

Bohanon and adds that Dr. Holsapple "will not opine that there is any connection between [her] care and Mr. Trott's paralysis/paraplegia."[87] Trott counters that "[n]othing in Dr. Holsapple's deposition testimony demonstrates that he cannot conclude that the negligence on part of the nurse defendants did not cause and/or contribute to Mr. Trott's paraplegia."[88] But, Trott's contention misses the mark. In the Rule 56 burden shifting equation, the defendant nurses have met their initial burden to show that no expert testimony exists to link their negligence to Trott's injuries. Trott does not demonstrate an existence of one or more genuine issues of material fact. To survive summary judgment, Trott must point to some expert medical testimony beyond speculation that the nurses' negligence proximately caused his injury. Dr. Holsapple offers none. Thus, summary judgment must be granted.

Dr. Holsapple's report, deposition, and supplemental correspondence fail to demonstrate with reasonable medical probability, that the alleged deviations by the Defendant Nurses proximately caused Trott's injuries. Dr. Holsapple candidly, and

report neurological changes to the Neurosurgical Providers caused or contributed to [Trott's] outcome") (citing Holsapple Dep. at 116-21; 124-20; 131-33; 152-55).

[87] Cessna Mot. at 5, ¶ 7.

[88] Ans. Matt & Bohanon at 6. The Court understands Trott's argument to be that Dr. Holsapple can demonstrate a causal connection between the nurses' negligence and Trott's injury; however, Trott fails to offer record evidence or legal authority to support his position.

repeatedly, testified that he could not opine that the nurses' deviations from the standard of care more likely than not changed the outcome.[89] Dr. Holsapple believed the nurses should have done more;[90] however, he could not offer an expert opinion that these failings proximately caused Trott's injury.

Nurses Matt and Bohanon assert that "Dr. Holsapple's testimony on the issue [of proximate causation] was equivocal at best and not sufficient to meet the standards set by Delaware law."[91] Trott replies that the use of the term "equivocal," "demonstrate[s] a clear issue of material fact."[92] But this response misapprehends the standard of proof required in a medical negligence action. Dr. Holsapple expressed his general disapproval of the timeliness of the nurses' responses to Trott's condition.[93] But, despite repeated questioning on the point, he would not offer an opinion within a reasonable degree of medical probability (or certainty) that the nurses' negligence proximately caused Trott's injury.[94] The Court is mindful that

---

[89] Holsapple Dep. at 116-21; 129; 132-33; 152-54.

[90] *Id.* at 124-29.

[91] Matt & Bohanon Mot. at 4, ¶ 10.

[92] Ans. Matt & Bohanon at 6.

[93] Holsapple Dep. at 124-29.

[94] *See e.g., Mammarella*, 93 A.3d at 636 (medical expert "testified that he could not opine on [plaintiff's] diagnosis or treatment to a reasonable degree of medical probability, and that any opinion about those issues would be speculative").

no talismanic phrase must be offered by an opining expert,[95] but Dr. Holsapple's "equivocation" amounts to speculation and falls short of the "expert medical testimony . . . as to the causation of the alleged personal injury or death" required by 18 *Del. C.* § 6853(e).[96]

In his supplemental report, offered to clarify any confusion prompted by his deposition testimony, Dr. Holsapple explained that his deposition testimony was consistent with the opinions he rendered in his original report.[97] But again, his report, deposition, and supplemental report fail to offer an expert opinion on causation. Contrary to Trott's counsel's assertion,[98] Dr. Holsapple's supplemental report does not definitively state that the nursing delay caused Trott's condition to worsen,[99] and counsel's argument cannot supplant the expert testimony required to

---

[95] *See Moses,* 109 A.2d at 568 (trial courts are afforded discretion "to determine whether the opinion offered by an expert, when considered in light of all of the evidence, meets [the "reasonable medical probability" or "reasonable medical certainty"] standard"); *Rizzuto v. Delaware Clinical and Laboratory Physicians, P.A.,* 2015 WL 3512369, at *5 (Del. Super Ct. Feb. 3, 2015) (quoting *Green v. Werner*, 766 A.2d 492, 495 (Del. 2001)) (Medical experts are not required to "couch their opinions in legal terms or to articulate the standard of care with a high degree of legal precision or with 'magic words.'")

[96] *See e.g.*, *Mammarella*, 93 A.3d at 634-35.

[97] Holsapple Supp. Rpt.

[98] Ans. Cessna at 5-6 (Representing that Dr. Holsapple's Supplemental Report "specifies that a delay of about 2 to 5-1/2 hours on part of the nursing in failing to communicate these neurological deficits is a significant delay causing the tragic outcome of Mr. Trott's condition.") (emphasis added).

[99] Holsapple Supp. Rpt.

establish causation to a reasonable medical degree of probability. Dr. Holsapple fails to offer the necessary opinion linking the nurses' failings as the cause of Trott's injury.

Trott contends that "[g]ranting defendants' motion is tantamount to precluding failure to communicate medical malpractice claims *as a matter of law* in the state of Delaware."[100] Not so. Rather, the Court's grant of defendants' motion reiterates the well-established requirement that expert medical testimony must be offered to support causation in medical negligence cases.[101] Where such a link is established, denial of summary judgment is appropriate. But that link is not established here. While what Trott describes as a "failure to communicate" claim may be difficult to prove, this difficulty does not compel the Court to disregard statutory requirements.

An expert need not be certain of subsequent actions of healthcare providers to opine on causation. But Dr. Holsapple did not offer an opinion that Trott's outcome would have differed had the nurses promptly informed other medical providers, including the Neurosurgery Team, of Trott's decline. Of course, expert witnesses may provide causation opinions in response to hypothetical scenarios.[102] But here,

---

[100] Ans. Matt & Bohanon at 7.

[101] 18 *Del. C.* § 6853(e).

[102] *O'Riley*, 69 A.3d at 1012 (citing *Stafford v. Sears, Roebuck & Co.*, 413 A.2d 1238, 1245 n.10 (Del. 1980)).

Dr. Holsapple in his initial report, deposition, and supplemental report declined to opine with medical probability or certainty that the nurses' negligence caused Trott's injury. Rather, Dr. Holsapple's testimony linking the nurses' care to Trott's injury was speculative; Trott fails to make a *prima facie* case on the issue of causation.[103]

## V.    CONCLUSION

Expert medical testimony must be offered to connect the nurses' negligence to Trott's injury, and this testimony must be offered with reasonable medical probability or certainty. Trott fails to forge that connection here. The Nurses' motions for summary judgment and Bayhealth's motion for partial summary judgment[104] are **GRANTED**.

**IT IS SO ORDERED.**

Sean P. Lugg, Judge

---

[103] *Kardos v. Harrison*, 980 A.2d 1014, 1019 (Del. 2009).

[104] *Clark v. Brooks,* 377 A.2d 365, 371 (Del. 1977) (cleaned up) ("Where the sole basis of liability of an employer is the negligence of the employee, the employer cannot be held liable unless the employee is shown to be liable; hence, if absence of culpability on the part of the employee to the injured person has been established by litigation, the employer cannot be held liable to the injured person").